**John T. Devlin, OSB No. 042690**
john@johndevlinlaw.com
Devlin Law, P.C.
1212 SE Spokane Street
Portland, OR 97202
Telephone: (503) 228-3015
Facsimile: (503) 660-4079

**Chad Stavley, OSB No. 034656**
chad@oregonaccidentattorney.com
Law Office of Chad Stavley, P.C.
434 NW 19th Avenue
Portland, OR 97209
Telephone: (503) 546-8812
Facsimile: (503) 243-1944

Of Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| BRENDA KAY NORDENSTROM, personal representative for the Estate of Bryan Perry, Deceased; and BRENDA KAY NORDENSTROM, an individual, <br><br> Plaintiff, <br><br> v. <br><br> CORIZON HEALTH, INC., a Tennessee Corporation; CLACKAMAS COUNTY, an Oregon county; JANA RACKLEY, an individual; CAMILLE VALBERG, an individual; NADIA PETROV, an individual; ALEX SALAZAR, M.D., an individual; SHAWN SHULTZ, an individual; BENJAMIN LEFEVER, an individual; MATT SAVAGE, an individual; RICKY PAURUS, an individual; LACEY SANDQUIST, an individual; RICHARD TAYLOR, an individua; NICK JOHNSON, an individual; MATRONA SHADRIN, an individual; and JOHN DOES 1-10, | Civil Action No. 3:18-cv-01754-HZ <br><br> **AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 USC § 1983) AND SUPPLEMENTAL STATE CLAIMS** <br><br> **DEMAND FOR TRIAL BY JURY** |

## **INTRODUCTION**

1.     On November 3, 2016, Bryan Perry (then age 31) was arrested on an outstanding warrant and taken to the Clackamas County Jail. When he was booked into the jail at 7:15 p.m., Mr. Perry was not able to control his bodily movements. Jail deputies chose not to send him to the hospital and instead placed him in a padded cell, where he continued to move around uncontrollably for the next four hours. One Clackamas County employee took two cell phone videos of Mr. Perry; several Clackamas County employees can be heard on the videos making fun of his inability to control his bodily movements. Corizon Health, Inc., which provides the medical care at the Clackamas County Jail, has a nationwide pattern and practice of failing to properly treat jail inmates experiencing drug or alcohol overdose or withdrawal. Consistent with this practice, a Corizon nurse only visited Mr. Perry twice, spending a total of less than five minutes with him. When another Corizon nurse went to check on Mr. Perry around 11:15 p.m., he became nonresponsive. He was pronounced dead of cardiac arrest at Kaiser Sunnyside Medical Center less than an hour later.

## **JURISDICTION AND VENUE**

2.     This action arises under the constitution and laws of the United States and jurisdiction is based on 28 USC § 1331 and 28 USC § 1343(a). This Court has pendent jurisdiction of the state law negligence claims pursuant to 28 USC § 1367.

## PARTIES

3.     Plaintiff Brenda Nordenstrom is the duly appointed personal representative of the Estate of Bryan Perry, deceased. Brenda Nordenstrom is the mother of Bryan Perry, deceased. Brenda Nordenstrom is a citizen and a resident of the State of Oregon. At the time of his death, Bryan Perry was a citizen and a resident of the State of Oregon. At all times herein pertinent, Bryan Perry was a pretrial detainee in the Clackamas County Jail.

4.     Bryan Perry was born in Portland, Oregon on April 7, 1985. He served in the United States Army during Operation Iraqi Freedom. He was honorably discharged and received a Purple Heart.

5.     Corizon Health, Inc. ("Corizon") is a Delaware corporation authorized to do business in the State of Oregon. Its business is providing medical services in jails and prisons nationally, and in the Clackamas County Jail specifically. At all times herein pertinent, Corizon was acting under color of state law.

6.     Clackamas County is an Oregon county. Clackamas County operates a jail, and has contracted with Corizon to provide all necessary medical care to pretrial detainees and persons convicted of crimes held at the Clackamas County Jail.

7.     Jana Rackley is a registered nurse who was employed by Corizon to work as a nurse in the Clackamas County Jail. On information and belief, she is a citizen and resident of the State of Oregon.

8.     Camille Valberg is a registered nurse who was employed by Corizon to work as a nurse in the Clackamas County Jail. On information and belief, she is a citizen and

resident of the State of Oregon.

9.    Nadia Petrov is a registered nurse who was employed by Corizon to work as the Director of Nursing in the Clackmas County Jail. On information and belief, she is a citizen and resident of the State of Oregon.

10.    Dr. Alex Salazar is a doctor who was employed by Corizon to work as the Medical Director in the Clackamas County Jail. On information and belief, he is a citizen and resident of the State of Oregon.

11.    Shawn Shultz is a Clackamas County employee who at all times pertinent was working in the Clackmas County Jail as a corrections officer. On information and belief, he is a citizen and resident of the State of Oregon.

12.    Benjamin Lefever is a Clackamas County employee who at all times pertinent was working in the Clackmas County Jail as a corrections officer. On information and belief, he is a citizen and resident of the State of Oregon.

13.    Matt Savage is a Clackamas County employee who at all times pertinent was working in the Clackamas County Jail as a corrections officer. On information and belief, he is a citizen and resident of the State of Oregon.

14.    Ricky Paurus is a Clackamas County employee who at all times pertinent was working in the Clackmas County Jail as a corrections officer. On information and belief, he is a citizen and resident of the State of Oregon.

15.    Lacey Sandquist is a Clackamas County employee who at all times pertinent was working in the Clackmas County Jail as a corrections officer. On information and

belief, she is a citizen and resident of the State of Oregon.

16.     Richard Taylor is a Clackamas County employee who at all times pertinent was working in the Clackmas County Jail as a corrections sergeant.  On information and belief, he is a citizen and resident of the State of Oregon.

17.     Nick Johnson is a Clackamas County employee who at all times pertinent was working in the Clackmas County Jail as a corrections sergeant.  On information and belief, he is a citizen and resident of the State of Oregon.

18.     Matrona Shadrin is a Clackamas County employee who at all times pertinent was working for the Clackamas County Interagency Task Force.  On information and belief, she is a citizen and resident of the State of Oregon.

19.     John Does 1-9 are Corizon employees and supervisors responsible for the provision of medical services at the Clackamas County Jail on November 3-4, 2016.  John Doe 10 is the unidentified male who was present and made comments when Deputy Shadrin recorded two cell phone videos of Mr. Perry.  At all times herein pertinent, defendants John Does 1-10 were acting under color of state law.

## FACTUAL ALLEGATIONS

20.     The Clackamas County Jail houses pretrial detainees and persons convicted of crimes.  Clackamas County is obligated by state and federal law to provide medical care for persons lodged in the Clackamas County Jail.  Clackamas County's duty to provide medical care is a nondelegable duty.

21.　　Commencing in July 2011, Clackamas County contracted with Corizon to provide medical care to pretrial detainees and persons convicted of crimes lodged in the Clackamas County Jail. Clackamas County paid Corizon a fee of more than $2,400,000 per year for its services.

22.　　Corizon agreed that its services "shall be designed to meet or exceed the standards promulgated and developed" by the National Commission on Correctional Health Care ("NCCHC"). Corizon also agreed that "[a] licensed healthcare professional will perform an intake screening on incoming inmates upon admission to the jail."

23.　　The NCCHC publishes "Standards for Health Services in Jails." NCCHC Standard J-E-02 states that it is "essential" that a "receiving screening is performed on all inmates on arrival at the intake facility to ensure that emergent and urgent health needs are met" and that "persons who are * * * severely intoxicated * * * or otherwise urgently in need of medical attention are * * * [r]eferred immediately for care and medical clearance into the facility." NCCHC Standard J-E-02 explains that "[m]edical clearance is a clinical assessment of physical and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room. The medical clearance is to be documented in writing."

24.　　NCCHC Standard J-G-07 states that it is "essential" that "[i]nmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility." NCCHC

Page 6 – Amended Complaint for Violation of Civil Rights and Suppl. State Claims

Standard J-G-07 also states that it is "essential" that that "[i]ndividuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using recognized standard assessments at appropriate intervals until symptoms have resolved."

25.     On November 3, 2016, at approximately 6:30 p.m., Bryan Perry was arrested on an outstanding warrant while walking at Eastport Plaza.  Steven Kays, a member of the Clackamas County Interagency Task Force ("CCITF"), recognized Mr. Perry and knew that he had an outstanding warrant.

26.     Oregon State Police Detective Matthew Fromme transported Mr. Perry from Eastport Plaza to the Clackamas County Jail.  During the transport, Mr. Perry talked with Detective Fromme about his prior military service and his plans to take a welding class at Clackamas Community College.  He told Detective Fromme: "Look at me.  I'm a mess.  I don't like this lifestyle."  Detective Fromme noted that Mr. Perry was displaying involuntary movements that increased as they got closer to the jail.  Detective Fromme also noted that Mr. Perry was polite and courteous during the entire transport.

27.     Clackamas County Sheriff's Office Detective Micah Hibpshman saw Mr. Perry at the scene of his arrest and at the Clackamas County Jail.  Detective Hibpshman noted that Mr. Perry was cooperative at the scene of his arrest and thought that Mr. Perry was high on methamphetamine.  Detective Hibpshman said that Mr. Perry was "tweaking" at the jail, which was not how Mr. Perry was acting at the scene of his arrest.  He noted that Mr. Perry's arms were moving all over the place but that he was verbally compliant.

28.     When they arrived at the Clackamas County Jail, Detective Fromme turned Mr. Perry over to the custody of the jail staff. The jail video shows that Mr. Perry was unable to control his bodily movements from the time he entered the jail. Mr. Perry was booked into the Clackamas County Jail at 7:15 p.m.

29.     Deputy Shawn Shultz completed a "Classification Screener" for Mr. Perry. Deputy Shultz indicated that Mr. Perry was under the influence of alcohol or drugs and included the comment "meth/bath salts." He selected "no" to the questions of whether Mr. Perry was showing "signs of alcohol/drugs withdrawals/sweating/needle marks/tremulouse/hallucinations" or had "current substance abuse needs." Deputy Shultz also indicated that Mr. Perry had current mental health needs and included the comment "couldn't remember meds." Deputy Shultz selected "no" to the questions of whether Mr. Perry was displaying "abnormal/bizarre behavior/dress" or was "delusional/incoherent/paranoid/passive/developmental disability." Deputy Shultz answered "no" to the questions of whether Mr. Perry had a "current need for E.R. treatment/signs of trauma" or "needs to be seen by a nurse." Sergeant Richard Taylor, who was the Booking Sergeant, approved this document.

30.     Deputy Shultz also completed a "Mental Health Screener" for Mr. Perry. This form indicated that he referred Mr. Perry to "medical" at 7:20 p.m. Deputy Shultz selected "no" to questions about whether Mr. Perry was displaying "bizarre behavior," was "under the influence drugs/alcohol," was "unable to follow simple commands," or was "speaking nonsense/gibberish."

Page 8 – AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

31. The video from the jail shows that Mr. Perry could not control his bodily movements during the intake process. Five deputies (including Ben Lefever, Shawn Shultz and Matt Savage) struggled to contain his movements, placing him in a chair to hold him down. Sergeant Taylor observed the process.

32. Deputy Lefever documented that Mr. Perry "could not stand up by himself or stand still. To search him, I had to help hold him up. His speech was barely coherent. He did not intentionally resist me, while I was trying to search him, but he had no control of his movements."

33. Deputy Savage documented that "[d]uring intake I witnessed Inmate Perry in what I perceived to be a highly intoxicated state. Inmate Perry was unable to control his movements, thrashing around in the chair he was seated in."

34. Sergeant Nick Johnson, who was the Housing Sergeant, documented that Mr. Perry was "moving uncontrollably and twitching. Although he was standing under his own power and will he could not hold still." He also documented that Mr. Perry "was not being uncooperative or combative [during the booking process] but just unable to sit still." He noted that Mr. Perry was taken to the "Booking High Security Cell."

35. Mr. Perry was placed into the High Security Cell, which is a holding cell specially designed with all surface areas constructed with padded material. The padding is used to prevent people from hurting themselves on hard surfaces.

36. The video from the jail shows that Mr. Perry was placed into the padded cell at 7:20 p.m. Deputy Lefever placed Mr. Perry in the cell. Deputy Savage and another

Page 9 – AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

deputy took off his pants, searched them, and the other deputy tossed the pants back into the cell. Mr. Perry did not put his pants back on and remained in his underwear. Sergeant Taylor observed the entire process.

37. Despite Corizon's contractual promise and the relevant NCCHC Standards, Mr. Perry did not have an intake or receiving screening prior to his admission into the jail.

38. Deputy Matrona Shadrin was a member of the CCITF and was present during Mr. Perry's arrest. She said that Mr. Perry was "apologetic," "answered appropriately," and "seemed fine" at the scene of his arrest. At approximately 7:40 p.m., Deputy Shadrin took a video on her phone of Mr. Perry in his cell. She said that "one of the correction guys called us over to take a look at him and see what he was doing. And it was so bizarre, like he just would not stop, that I actually ended up recording it." The jail video shows that Deputy Paurus pointed towards Mr. Perry's cell as Deputy Shadrin approached him. She also said: "For me, it was so bizarre to see him from the scene to what he was doing at the jail. And, um, I remember even asking them, going this is so bizarre, like when did this start? Did it start when he got here or, um, you know it was just that's so weird because he wasn't like that. The jail staff said that he was like that when he got there."

39. Deputy Shadrin recorded two videos on her cell phone. Each video is approximately one minute in length. The videos show Mr. Perry moving uncontrollably in his cell and making unintelligible noises. The cell phone videos also recorded the voices of the people watching Mr. Perry.

40. The jail video shows that, on information and belief, Deputy Paurus and Deputy Sandquist were present when Deputy Shadrin took one or both of the cell phone videos, along with another male known as John Doe 10.

41. On information and belief, Deputy Lefever saw that Deputy Shadrin was taking the cell phone videos but did not participate in the recorded discussion. On information and belief, Deputy Lefever did not attempt to stop Deputy Shadrin from taking the cell phone videos.

42. On the first cell phone video, on information and belief, Deputy Sandquist asks Deputy Shadrin: "Part of the case, right?" On information and belief, Deputy Shadrin responds: "Well, yeah, he's on a PV for drugs." On information and belief, Deputy Sandquist suggests that Mr. Perry should "go to the schools" as "the new DARE." On information and belief, John Doe 10 says: "You could just take him and put him in the front of the class." The group laughs and, on information and belief, Deputy Sandquist responds: "That would be fantastic." On information and belief, Deputy Paurus suggests that "you could just wheel him in in a cage and wheel him back out." On information and belief, Deputy Sandquist responds: "Just let him sit there for, like, ten minutes and then 'don't do drugs' and then wheel him back out." On information and belief, Deputy Paurus says: "Look what I got for show and tell today." On information and belief, Deputy Sandquist says: "And then one kid – 'that's my dad.'" On information and belief, Deputy Paurus responds: "That's awful. I mean, that's absolutely awful." As Mr. Perry's face moves toward the camera, on information and belief, Deputy Shadrin says: "Please, no face

Page 11 – AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

shots." On information and belief, Deputy Shadrin says: "I wish we could show this to his girlfriend like, 'you love this?'"

43.    On the second cell phone video, on information and belief, Deputy Shadrin says: "I'm glad we took him before this kicked in." On information and belief, Deputy Paurus says: "This poor guy." When Mr. Perry momentarily locks his hands behind his head and leans forward, on information and belief, Deputy Shadrin says: "Crunches." When it appears that Mr. Perry's underwear might come off, on information and belief, Deputy Paurus says: "You might get an eyeful so be careful."

44.    On information and belief, no one was disciplined or fired for taking these videos or making the comments that were recorded.

45.    Sergeant Johnson observed Mr. Perry approximately 20-30 minutes after he was placed in the padded cell. Mr. Perry was "laying on the bench flopping around flaring his arms and legs uncontrollably. At one point Mr. Perry sat himself up on the bench and began rocking back and forth. Again, it was apparent he was intoxicated on some type of drug."

46.    Sergeant Johnson was present during a conversation between Sergeant Taylor and a Corizon nurse named Jana Rackley. Sergeant Taylor and Nurse Rackley were discussing "Mr. Perry's behavior and tried to figure out what drugs Mr. Perry and [sic] consumed in order to provide the best plan medically should Mr. Perry begin to have medical issues." Sergeant Taylor and Nurse Rackley then spoke with Bridgette Mountsier, who was arrested at the same time as Mr. Perry, "about what drugs Mr. Perry possibly

consumed." Before Ms. Mountsier was returned to her cell, she yelled "I love you Bryan" and Mr. Perry responded "I love you too."

47.    Sergeant Johnson then saw Sergeant Taylor and Nurse Rackley go into Mr. Perry's cell. He documented this interaction: "Sgt. Taylor had multiple Deputies enter the cell and hold on to Mr. Perry who was lying on the floor so Nurse Jana could get a good read on his vitals. Mr. Perry was still moving around uncontrollably so that is why the Deputies had to hold on to him. Mr. Perry was not being uncooperative he just couldn't hold still because of the drugs he had in his system."

48.    The jail video shows that four deputies (LeFever, Shultz, Sandquist and an unidentified male) entered Mr. Perry's cell at 7:55 p.m. They held him down on the ground and Nurse Rackley approached him. They spent a total of two minutes inside the cell. As soon as they released Mr. Perry, he continued to move around uncontrollably. Someone brought in a cup of water, but Mr. Perry knocked it over.

49.    The Corizon medical file contains a note prepared by Nurse Rackley. Nurse Rackley wrote: "This RN went to speak with Sergeant Taylor regarding another issue and was asked to look at this pt, he was a new incoming. Pt reported taking meth, heroin and bath salts today. Pt visibly out of control, flopping all over the HS cell. Appeared pt could not control his movements. Deputies tried to assist me getting [vital signs.] HR: 86. O2% -- 91. T: 98.6. Pt is clearly out of breath and breathing rapidly, will attempt to reassess in an hour." The note is dated November 3, 2016 and timed 8:43 p.m.

50. At approximately 8:30 p.m., Sergeant Johnson was alerted that Ms. Mountsier "had all of a sudden started flopping around and acting just like Mr. Perry. The other women in the holding tank were becoming frightened and upset because she was begin [sic] to uncontrollably twitch, flair her arms and legs and could not hold still." Several deputies moved Ms. Mountsier to a single cell, where "she walked a few steps into the center of the cell where she fell straight on her head."

51. Several deputies (including Savage, Sandquist, Paurus and Lefever) moved Ms. Mountsier to the medical office. Sergeant Taylor was present as well. Sergeant Johnson told the deputies to put Ms. Mountsier in a restraint chair. The jail video shows that Ms. Mountsier was placed in a restraint chair outside the medical office.

52. A Corizon nurse named Camille Valberg took Ms. Mountsier's vital signs while she was in the restraint chair. The jail video shows that Nurse Rackley saw Ms. Mountsier in the restraint chair and talked with Deputy Sandquist and another deputy. Nurse Rackley laughed while she was talking with the deputies.

53. Ms. Mountsier remained outside the medical office in the restraint chair until approximately 9:16 p.m., when she was moved to the booking area in the restraint chair. EMS personnel responded and took her to Kaiser Sunnyside Medical Center at approximately 9:34 p.m. Ms. Mountsier was treated at Kaiser Sunnyside and survived.

54. Sergeant Johnson documented that "[k]nowing that Ms. Mountsier had consumed something and her erratic behavior indicated she had ingested drugs although she was now having a more severe reaction to it than Mr. Perry. Again both of these

Page 14 – AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

inmates came in together and with similar symptoms now occurring the decision was made to transport Ms. Mountsier to the hospital." Sergeant Johnson asked Nurse Rackley and two deputies to check on Mr. Perry.

55.     The jail video shows that Deputy Lefever and an unidentified deputy entered Mr. Perry's cell at 9:16 p.m. and gave him some water. Nurse Rackley entered the cell at 9:17 p.m. and spent less than three minues with Mr. Perry. She did not prepare a contemporaneous record of her interaction with Mr. Perry. The deputies remained in the cell to give him some more water, then exited the cell at 9:20 p.m.

56.     Sergeant Taylor documented on a "Watch Log" that a watch was started for Mr. Perry at 9:36 p.m. Various deputies (including Lefever, Johnson and Sandquist) periodically checked on Mr. Perry through the window of the padded cell. The jail video shows that Mr. Perry was still moving uncontrollably. Deputy Lefever gave more water to Mr. Perry at 9:35 p.m. and 10:26 p.m.

57.     Deputy Sandquist later told an investigator that there was no formal check set up for Mr. Perry. Because he was unable to control his bodily movements, the deputies were checking on him whenever they checked other inmates who were on suicide watch. She said that Mr. Perry acted like he had bugs under his skin, sporadically moving his hands all over his body and uncontrollably moving his limbs all over the place. He did not display any steady movements, did not sit down and did not lay down. He moved sporadically from one area of the room to the next.

58.     The jail video shows that Nurse Valberg was in the hallway outside Mr. Perry's cell three times between 10:05 p.m. and 10:10 p.m. She did not look into Mr. Perry's cell.

59.     Sergeant Johnson documented that he "went down to Medical and talked to Nurse Camille [Valberg] to double check to see if she was up to date on Mr. Perry and his condition and to insure she did another check on him. I knew Nurse Jana [Rackley] was on her way out of the facility and off duty. Nurse Jana to my knowledge was the last to check Mr. Perry so I wanted to make sure Nurse Camille was going to check Mr. Perry again. Nurse Camille was aware she needed to check him again and asked me to put Mr. Perry in the restraint chair so she could get a good set of vitals. I explained to her that I would not put Mr. Perry in the restraint chair at that time. I explained to her some different situations where we could use the chair although up to this time Mr. Perry was not hurting himself, in danger of hurting himself or actively being aggressive or combative towards anybody. In fact I knew already that Nurse Jana had just got vitals without incident and with the Deputies present they would be assisting her in get [sic] vitals the next check Nurse Camille did."

60.     The jail video shows that Nurse Valberg looked into Mr. Perry's cell at 10:47 p.m. but did not go inside. The jail video shows that Mr. Perry was still moving uncontrollably at 10:47 p.m.

61.     Deputy Savage documented that, at approximately 11:00 p.m., Nurse Valberg "came into the Matrix office and stated she was sorry for being so slow tonight

Page 16 – AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

and that she had been very busy. She stated she was going to check Inmate Perry, Bryan Everett soon and then she would be back to her normal duties. I informed her that he had taken Methamphetamine, Bath Salts and Heroin today. I informed her that she should call and have a Sergeant stand by due to his thrashing in the cell and unpredictability from the chemicals he had in his system. I had written a report hours earlier about having to restrain Inmate Mountsier, the female he was arrested with after she also began thrashing around. We talked for a bit longer and then she left."

62.     The jail video shows that Nurse Valberg and a Corizon nurse named Lydia Cronin looked into Mr. Perry's cell at 11:07 p.m. but did not go inside. The jail video shows that Mr. Perry was still moving uncontrollably at 11:07 p.m.

63.     The jail video shows that Deputy Lefever, Deputy Savage and Nurse Valberg entered the cell at 11:16 p.m. Deputy Savage tried to help Mr. Perry to sit up. Deputy Lefever offered a cup of water but Mr. Perry could not take it. Deputy Paurus entered the cell and extended Mr. Perry's arm so that Nurse Valberg could attempt to take a blood pressure reading. Nurse Valberg briefly left the cell at 11:20 p.m. The three deputies remained in the cell. Nurse Valberg returned and again tried to get a blood pressure reading. Deputy Sandquist entered the cell. Nurse Valberg began a sternum rub on Mr. Perry and lifesaving measures were started at 11:23 p.m.

64.     At 11:23 p.m., AMR received a call indicating that an inmate at the Clackamas County Jail had experienced "cardiac arrest."

65.     Deputy Sandquist documented on a "Watch Log" that she checked on Mr. Perry at 11:30 p.m. and that Mr. Perry was "laying down." The jail video shows that jail deputies and EMTs were performing lifesaving measures on Mr. Perry at 11:30 p.m.

66.     At 11:33 p.m., AMR personnel began their treatment of Mr. Perry. The AMR records indicate that someone told the EMTs that Mr. Perry was "found down unconscious/unresponsive, pulseless and apneic on a cell bench by CCSO corrections personnel."

67.     Deputy Sandquist documented on a "Watch Log" that she checked on Mr. Perry at 11:38 p.m. and that Mr. Perry was "laying down." The jail video shows that EMTs were performing lifesaving measures on Mr. Perry at 11:38 p.m.

68.     At 11:56 p.m., AMR personnel departed the Clackamas County Jail with Mr. Perry. They arrived at Kaiser Sunnyside Medical Center at 12:07 a.m. on November 4, 2016.

69.     Mr. Perry was declared dead at 12:16 a.m. on November 4, 2016. The cause of death was listed as cardiac arrest.

70.     At 4:14 a.m., someone made the following entry into the Corizon medical chart: "Pt booked into CCJ earlier this evening, presenting with appearant [sic] drug use behavior, unable to sit still, uncooperative and agitated. Pt monitored [sic] and vitals cked. Pts girlfriend, at time of intake, stated pt had taken bath salts. At approx. 2315 when this nurse and 4 deputies/sergeants entered pts cell to take vitals, pt was cooperative and sat up when asked. As soon as the BP cuff was placed on pt, this nurse immediately had problems

obtaining a manual BP. Pt pulse was found to be absent at point of auscultaion [sic]. EMS was called. AED was applied with no shocks administered. CPR was started. No medications administered." This note, which is entitled "Emegency Department Referral," does not have an author, but the context suggests that it was written by Nurse Valberg.

71. The jail video shows that Mr. Perry was not able to sit up when asked. Deputy Savage helped him into a slumped position on the bench.

72. At 5:12 a.m., Nurse Valberg prepared a "late entry" chart note. In that note, she wrote: "Pt booked into CCJ earlier this eve. Pt was seen shorly [sic] by on duty medical, but it was reported that medical was unable to do a full intake due to reaction of appearant [sic] drug use. Vitals were taken at that time. Vitals were repeated again a second time by medical. At approx. 2310 pt was assessed a 3rd time by this RN. This nurse, accompanied by 4 deputies/sergeants, entered pts cell to obtain vitals. Pt has previously been in an agitated stated [sic], appearing to be not of control of his body movements. Upon entering the cell pt was responsive and cooperative. Pt sat up when ask to and responded cooperatively to having his BP taken. A manual BP cuff was placed on the pt and this nurse attempted to acquire a BP. Pt suddenly appeared to go unresponsive. This nurse ordered for EMS and an AED. Pulse was unable to be found upon auscultation [sic]. Sternal rub produced no response. AED was placed. No shocks were administered. CPR was started. EMS arrived and took over at approx. 2325. After approx 20 min of resuscitation pt acquired a heart beat and was transported to Kaiser Sunnyside Hospital."

73.     The jail video shows that Mr. Perry did not sit up when asked to and did not respond cooperatively to having his blood pressure taken. Deputy Savage helped him into a slumped position on the bench. Deputy Paurus had to extend his arm so that Nurse Valberg could attempt to take his blood pressure.

74.     At 7:48 a.m., a Corizon nurse named Nadia Petrov prepared a Corizon Emergency Department Referral form, stating that the reason for the referral was "altered mental status – drug overdose, collapsed during vitals check. AMS activated." The onset was described as "sudden." The vital signs were "unable to obtain, collapsed." The doctor who approved the referral was listed as "A. Salazar, MD." The Corizon medical file contains a second version of this form, signed by Ms. Petrov, with the time and date changed by hand to November 3, 2016 at 11:50 p.m. Ms. Petrov was the Director of Nursing for the jail, and Dr. Salazar was the Medical Director for the jail.

75.     Later that day, Deputy State Medical Examiner (Dr. Larry Lewman) performed an autopsy on Mr. Perry. The cause of death was listed as methamphetamine toxicity.

76.     At 1:14 p.m. on November 5, 2016, Nurse Rackley prepared a "late entry" chart note. In that note, she wrote: "This RN checked on pt 11/3/16 around 2130. Pt had been asking for water. 2 deputies assisted me with pt. Pt was easily following directions. Pt had better control over his body movements and was able to sit on the bench. I was able to obtain a BP, which was unobtainable the first time I checked in with pt d/t uncontrollable body movements. BP: 90/52, HR:97, O2: 91-92%. This RN asked pt what he had taken

again. Pt responded with meth, heroin and bath salts. Deputy asked pt why take so much. Pt responded with 'I have been using for so long and my tolerance is up.' Pt was able to have conversation, understanding and following directions. Pt was making sense. This RN told Sergeant Johnson we were going to evaluate pt for now as he was responding better both physically and cognitively. Sergeant Johnson was OK with this plan. Advised increased fluids for pt, especially since he was requesting. Report passed on to Camille, RN. Advised pt be rechecked within the hour and frequently after."

77.     The jail video shows that Nurse Rackley spent less than 140 seconds with Mr. Perry. The jail video does not show the type of interactions that would have allowed Nurse Rackley to evaluate Mr. Perry's ability to understand and follow directions or to "make sense."

78.     After Mr. Perry's death, Deputy Lefever told an investigator: "He was the highest I've seen someone, since I've, I mean, not that I've worked here that long, but since I've worked here, I haven't seen that before."

79.     On information and belief, no one was disciplined or fired for their treatment of Mr. Perry.

### CORIZON'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF JAIL INMATES SUFFERING FROM ALCOHOL OR DRUG OVERDOSE OR WITHDRAWAL

80.     Corizon was formed in 2011 following the merger of Prison Health Services ("PHS") and Correctional Medical Services ("CMS").

81.    In November 2006, Senior District Judge Richard Enslen of the United States District Court for the Western District of Michigan wrote in a published opinion: "Here is the basic message: You are valuable providers of life-saving services and medicines. You are not coat[]racks who collect government paychecks while your work is taken to the sexton for burial. If a patient does not receive necessary medical or psychological services, including medicines and specialty care, it is not his problem, it is your problem, a problem that must be solved at lunch, nights or weekends, if necessary. If someone in the bureaucracy, including CMS, is stopping you from providing necessary services in a timely way, or stopping the patient from obtaining necessary specialist care or medicine, you should pester the malefactors until they respond and the services are provided. If they still won't relent, you are to relay their names, including correct spellings and addresses at which they may be arrested, to the medical monitor so these persons may be held in contempt and jailed, if necessary. The days of dead wood in the Department of Corrections are over, as are the days of CMS intentionally delaying referrals and care for craven profit motives."

82.    In December 2006, the Civil Rights Division of the United States Department of Justice sent a report to the Governor of Delaware summarizing the findings of its investigation into the care provided by CMS to prisoners at five Delaware facilities. The report stated that "[o]ur investigation revealed that patients with life-threatening conditions are not receiving timely care."

83.    In July 2007, Isaac Bennett died in the City Justice Center, located in Missouri, of cardiac arrest due to heroin withdrawal. CMS had the contract to provide medical care at the jail. In February 2014, Corizon agreed to pay a confidential amount to resolve a wrongful death claim related to Mr. Bennett's death.

84.    In August 2010, Martin Harrison died in the Santa Rita Jail, located in California, after going into severe alcohol withdrawal. PHS had the contract to provide medical care at the jail. In February 2015, Corizon and Alameda County agreed to pay $8,300,000 to resolve a wrongful death claim related to Mr. Harrison's death. Corizon also agreed to change its policies to ensure that registered nurses conducted receiving screenings and patient assessments and to provide training for jail staff "on alcohol and other drug problems, including intoxication and withdrawal, mental health and medical emergencies, and the appropriate communications to medical and mental health staff."

85.    In March 2011, a jury in the United States District Court for the Middle District of Florida found that PHS was deliberately indifferent to the serious medical needs of Brett Fields, who was suffering from a spinal abscess but was not sent to the hospital by PHS staff in a timely fashion. The jury awarded $700,000 in compensatory damages and $500,000 in punitive damages. In September 2012, the United States Court of Appeals for the Eleventh Circuit affirmed the jury's verdict. In its opinion, the Court wrote: "The evidence at trial supports the jury's determination that [PHS] had a policy that delayed treatment of serious medical problems." The Court also wrote: "The jury could have concluded that [PHS] delayed treatment to save money, which is not a medical

Page 23 – AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

justification."

86.     In April 2012, Savannah Sparks died in the New Jail Complex run by the Louisville Metro Department of Corrections, located in Kentucky, as a result of heroin withdrawal. Corizon had the contract to provide medical care at the jail. An investigation by the Louisville Metro Department of Corrections revealed that Corizon staff failed to follow procedures for inmates going through detoxification and failed to have Ms. Sparks seen by a doctor. Corizon did not discipline any staff members following Ms. Sparks' death. In November 2012, the Louisville Metro Department of Corrections communicated its findings to the senior leadership of Corizon, including the Chief Medical Officer and a Senior Vice President of Operations. Among other things, the Louisville Metro Department of Corrections concluded that one Corizon employee "appeared to have been misleading during Inmate Sparks death investigation." The Senior Vice President said that Corizon would take full responsibility for its actions publicly and financially. In 2013, Corizon agreed to pay a confidential amount to resolve a wrongful death claim related to Ms. Sparks' death.

87.     In April 2013, Kyle Bigbee was booked into the Clackamas County Jail. His jail file contained documentation that he had been diagnosed with colitis and had a jejunostomy tube. Mr. Bigbee did not have an intake medical screening from a Corizon staff member for approximately 39 hours. Mr. Bigbee was released from the jail about one hour after his intake medical screening. Following his release from jail, Mr. Bigbee went to OHSU to be treated for dehydration. In April 2017, Magistrate Judge Stacie Beckerman

of the United States District Court for the District of Oregon issued Findings and Recommendation in a lawsuit brought by Kyle Bigbee against Clackamas County. Judge Beckerman wrote that "[t]he Corizon staff's goal, absent an emergency, is to evaluate inmates within twenty-four hours of their arrival, although Corizon's contract with the County provides that Corizon personnel will screen all inmates immediately upon admission into the jail."

88. In April 2014, Madaline Pitkin died in the Washington County Jail as a result of heroin withdrawal. Corizon had the contract to provide medical care at the jail. An investigation by The Oregonian revealed that Ms. Pitkin did not get adequate medical treatment despite her repeated requests for help and her worsening symptoms of withdrawal. In November 2014, the Board of Nursing for the State of Oregon reprimanded a Corizon nurse for her conduct in connection with Ms. Pitkin.

89. In January 2015, Daniel Wichterman died in the City of Philadelphia's Police Detention Unit, located in Pennsylvania, of a drug overdose. Corizon had the contract to provide medical care at the Police Detention Unit. In November 2016, a wrongful death lawsuit was filed against Corizon, the City of Philadelphia, and various employees, alleging that the defendants failed to treat Mr. Wichterman's serious medical need of opiate overdose.

90. In April 2015, Magistrate Judge Thomas Coffin of the United States District Court for the District of Oregon issued an Order denying Corizon's motion for summary judgment in Derek Johnson, et al. v. Corizon Health, Inc., et al. Judge Coffin wrote that

"the evidence lends itself to an inference that Corizon, perhaps in conjunction with Lane County, implemented a policy of not screening inmates upon intake. * * * [A] trier of fact could conclude that Corizon had a policy of not providing medical/mental health screening contrary to its own contractual obligations and that policy was a moving force behind Green's injury." He also wrote that "an inference can be drawn that Corizon did have a policy of delaying treatment at the ER to avoid the cost of hospitalization and that policy was a moving force behind the decision to not immediately send Green to the ER."

91.    In May 2015, Tyler Tabor died in the Adams County Detention Facility, located in Colorado, of dehydration caused by drug withdrawal. Corizon had the contract to provide medical care at the jail. In June 2016, a wrongful death lawsuit was filed against Corizon, Adams County, and various employees, alleging that the defendants failed to take Mr. Tabor to the hospital, failed to have him seen by a doctor in the jail, and failed to treat his serious medical need of opiate withdrawal.

## FIRST CLAIM FOR RELIEF

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983

92.    Plaintiff (individually and as personal representative of Mr. Perry's estate) realleges and incorporates herein as though set forth in full paragraphs 1 through 91, above.

93.    Defendants Shultz, Lefever, Savage, Paurus, Sandquist, Shadrin, Taylor, Johnson and John Doe 10 were deliberately indifferent to Mr. Perry's rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

a. In failing to send Bryan Perry to a hospital instead of admitting him into the Clackamas County Jail;

b. In failing to provide Bryan Perry with prompt medical attention to his serious medical needs;

c. In failing to conduct proper cell checks on Bryan Perry;

d. In failing to respond properly to the fact that Bryan Perry was overdosing on drugs; and

e. In failing to promptly transfer Bryan Perry from the Clackamas County Jail to a hospital for diagnosis and treatment at any point after his admission into the Clackamas County Jail.

94.     Defendants Rackley and Valberg were deliberately indifferent to Mr. Perry's rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

a. In failing to ensure that Bryan Perry was properly screened before being admitted into the Clackamas County Jail;

b. In failing to ensure that Bryan Perry was seen by a doctor;

c. In failing to properly treat Bryan Perry's serious medical needs;

d. In failing to recommend a transfer of Bryan Perry from the Clackamas County Jail to a hospital for diagnosis and treatment at any point after his admission into the Clackamas County Jail;

e.  In failing to ensure that employees of the Clackamas County Jail had proper training in screening people for medical problems before admission into the jail;

f.  In failing to ensure that employees of the Clackamas County Jail had proper training in responding to the serious medical needs of jail inmates; and

g.  In failing to ensure that employees of the Clackamas County Jail had proper training in responding to inmates experiencing drug or alcohol overdose or withdrawal.

95.     As a direct result of the actions and inactions of defendants as set forth in paragraphs 93 and 94, above, Bryan Perry endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of cardiac arrest. Mr. Perry's mother has been denied his love, society and companionship. Mr. Perry's estate incurred expenses for medical services, burial services and memorial services. Bryan Perry's estate and his mother are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

96.     The actions of defendants Shultz, Lefever, Savage, Paurus, Sandquist, Shadrin, Taylor, Johnson, John Doe 10, Rackley and Valberg were recklessly indifferent to the civil rights of Bryan Perry and his mother, and callously disregarded Bryan Perry's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

97. Plaintiff is entitled to her necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## SECOND CLAIM FOR RELIEF

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983

### *Monell* Claims

98. Plaintiff (individually and as personal representative of Mr. Perry's estate) realleges and incorporates herein as though set forth in full paragraphs 1 through 97, above.

99. The moving forces that resulted in the deprivation of the Eighth and/or Fourteenth Amendment rights of Bryan Perry and his mother were the following policies, customs or practices of Clackamas County and Corizon:

    a.    A policy, custom or practice of not providing intake screenings at or near the time of booking;

    b.    A policy, custom or practice of providing insufficient medical coverage;

    c.    A policy, custom or practice of hiring personnel indifferent to the medical needs of inmates;

    d.    A policy, custom or practice of denying inmates medically necessary transfers to hospitals;

    e.    A policy, custom or practice of failing to ensure that employees of the Clackamas County Jail had proper training in screening people for medical problems before admission into the jail;

f.   A policy, custom or practice of failing to ensure that employees of Clackamas County and Corizon had proper training in responding to the serious medical needs of inmates;

g.   A policy, custom or practice of failing to ensure that employees of Clackamas County and Corizon had proper training in responding to inmates experiencing drug or alcohol overdose or withdrawal; and

h.   A policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical services for jail inmates.

100.   The policies of defendants Corizon and Clackamas County posed a substantial risk of causing substantial harm to Clackamas County inmates, and Corizon and Clackamas County were aware of the risk.

101.   As a direct result of the policies, customs or practices of Corizon and Clackamas County, Bryan Perry was not provided with timely medical care. As a direct result of the policies, customs or practices of Corizon and Clackamas County, Bryan Perry endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of cardiac arrest. Mr. Perry's mother has been denied his love, society and companionship. Mr. Perry's estate incurred expenses for medical services, burial services and memorial services. Bryan Perry's estate and his mother are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

102.    The actions of defendant Corizon were recklessly indifferent to the civil rights of Bryan Perry and his mother, and callously disregarded Bryan Perry's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

103.    Plaintiff is entitled to her necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## THIRD CLAIM FOR RELIEF

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983

### Supervisory Liability

104.    Plaintiff (individually and as personal representative of Mr. Perry's estate) realleges and incorporates herein as though set forth in full paragraphs 1 through 97, and paragraph 99, above.

105.    Defendants Salazar, Petrov and John Does 1-9, in their supervisory capacities, were aware of the policies, customs or practices as alleged in paragraph 98, above, and were aware that said policies, customs or practices created a substantial risk of causing substantial harm to Clackamas County inmates by endangering their physical safety and their medical and mental health needs.    Despite their knowledge, said supervisors allowed, approved of and ratified said policies, customs or practices.

106.    Defendants Salazar, Petrov and John Does 1-9, in their supervisory capacities, failed to adequately train Corizon employees:

a. To conduct an intake screening of people at or near the time when they are booked into the Clackamas County Jail;

b. To provide people housed in the Clackamas County Jail with prompt medical attention to their serious medical needs;

c. To respond properly to an inmate experiencing drug or alcohol overdose or withdrawal;

d. To recognize medical emergencies; and

e. To transfer people housed in the Clackamas County Jail to the hospital if the person is experiencing a medical emergency.

107. Defendants Salazar, Petrov and John Does 1-9 were aware that the failure to train set forth in paragraph 106, above, created a substantial risk of causing harm to Clackamas County inmates.

108. As a direct result of the actions and inactions of defendants Salazar, Petrov and John Does 1-9, Bryan Perry endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of cardiac arrest. Mr. Perry's mother has been denied his love, society and companionship. Mr. Perry's estate incurred expenses for medical services, burial services and memorial services. Bryan Perry's estate and his mother are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

109. The actions of defendants Salazar, Petrov and John Does 1-9 were recklessly indifferent to the civil rights of Bryan Perry and his mother, and callously disregarded

Bryan Perry's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

110. Plaintiff is entitled to her necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## FOURTH CLAIM FOR RELIEF

### Negligence

111. Plaintiff (as personal representative of Mr. Perry's estate) realleges and incorporates herein as though set forth in full paragraphs 1 through 91, above.

112. The actions of defendants Corizon and Clackamas County, acting by and through their employees and agents, were negligent in one or more of the following particulars:

    a. In failing to send Bryan Perry to a hospital instead of admitting him into the Clackamas County Jail;

    b. In failing to provide Bryan Perry with prompt medical attention to his serious medical needs;

    c. In failing to conduct proper cell checks on Bryan Perry;

    d. In failing to respond properly to the fact that Bryan Perry was overdosing on drugs;

    e. In failing to promptly transfer Bryan Perry from the Clackamas County Jail to a hospital for diagnosis and treatment at any point after his admission into the Clackamas County Jail;

f. In failing to ensure that Bryan Perry was properly screened before being admitted into the Clackamas County Jail;

g. In failing to ensure that Bryan Perry was seen by a doctor;

h. In failing to properly treat Bryan Perry's serious medical needs;

i. In failing to ensure that employees of the Clackamas County Jail had proper training in screening people for medical problems before admission into the jail;

j. In failing to ensure that employees of the Clackamas County Jail had proper training in responding to the serious medical needs of jail inmates; and

k. In failing to ensure that employees of the Clackamas County Jail had proper training in responding to inmates experiencing drug or alcohol overdose or withdrawal.

113. The actions of defendants Corizon, Clackamas County, Salazar, Petrov and John Does 1-9, and each of them, were negligent in one or more of the following particulars:

a. In allowing, approving and ratifying the policies, customs or practices as alleged in paragraph 98, above;

b. In failing to adequately train Corizon and Clackamas County employees to conduct an intake screening of people at or near the time when they are booked into the Clackamas County Jail;

c. In failing to adequately train Corizon and Clackamas County employees to provide people housed in the Clackamas County Jail with prompt medical attention to their serious medical needs;

d. In failing to adequately train Corizon and Clackamas County employees to respond properly to an inmate experiencing drug or alcohol overdose or withdrawal;

e. In failing to adequately train Corizon and Clackamas County employees to recognize medical emergencies; and

f. In failing to adequately train Corizon and Clackamas County employees to transfer people housed in the Clackamas County Jail to the hospital if the person is experiencing a medical emergency.

114. As a direct result of the actions and inactions of defendants, and each of them, Bryan Perry endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of cardiac arrest. Mr. Perry's mother has been denied his love, society and companionship. Mr. Perry's estate incurred expenses for medical services, burial services and memorial services. Bryan Perry's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

115. Notice pursuant to the Oregon Tort Claims Act was given to defendant Clackamas County within the time prescribed by law.

## FIFTH CLAIM FOR RELIEF

### Gross Negligence/Reckless Misconduct

116. Plaintiff (as personal representative of Mr. Perry's estate) realleges and incorporates herein as though set forth in full paragraphs 1 through 115, above.

117. Defendant Corizon, by and through its employees acting within the scope of their employment, was grossly negligent and acted with reckless misconduct in one or more of the following particulars:

    a. In failing to send Bryan Perry to a hospital instead of admitting him into the Clackamas County Jail;

    b. In failing to provide Bryan Perry with prompt medical attention to his serious medical needs;

    c. In failing to conduct proper cell checks on Bryan Perry;

    d. In failing to respond properly to the fact that Bryan Perry was overdosing on drugs;

    e. In failing to promptly transfer Bryan Perry from the Clackamas County Jail to a hospital for diagnosis and treatment at any point after his admission into the Clackamas County Jail;

    f. In failing to ensure that Bryan Perry was properly screened before being admitted into the Clackamas County Jail;

    g. In failing to ensure that Bryan Perry was seen by a doctor;

    h. In failing to properly treat Bryan Perry's serious medical needs;

i. In failing to ensure that employees of the Clackamas County Jail had proper training in screening people for medical problems before admission into the jail;

j. In failing to ensure that employees of the Clackamas County Jail had proper training in responding to the serious medical needs of jail inmates; and

k. In failing to ensure that employees of the Clackamas County Jail had proper training in responding to inmates experiencing drug or alcohol overdose or withdrawal.

118. As a direct result of the misconduct of defendant Corizon, Bryan Perry endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of cardiac arrest. Mr. Perry's mother has been denied his love, society and companionship. Mr. Perry's estate incurred expenses for medical services, burial services and memorial services. Bryan Perry's estate is entitled to compensatory damages in whatever amount the jury concludes is appropriate.

119. The actions of defendant Corizon were grossly negligent, were recklessly indifferent to the civil rights of Bryan Perry and his mother, and callously disregarded Bryan Perry's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

WHEREFORE, Plaintiff prays for judgment as follows:

**On the First Claim for Relief**, for judgment against defendants Shultz, Lefever, Savage, Paurus, Sandquist, Shadrin, Taylor, Johnson, John Doe 10, Rackley and Valberg, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages in whatever amount the jury concludes is appropriate and for necessarily and reasonably incurred attorney fees and costs;

**On the Second Claim for Relief**, for judgment against defendants Corizon and Clackamas County, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages against defendant Corizon in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

**On the Third Claim for Relief**, for judgment against defendants Salazar, Petrov and John Does 1-9, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

**On the Fourth Claim for Relief**, for judgment against defendants, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs;

**On the Fifth Claim for Relief**, for judgment against defendant Corizon for compensatory damages in whatever amount the jury concludes is appropriate, for punitive damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs.

DATED this 2nd day of March, 2020.

DEVLIN LAW, P.C.

/s/ John T. Devlin
John T. Devlin
Oregon State Bar No. 042690

LAW OFFICE OF CHAD STAVLEY, P.C.

/s/ Chad Stavley
Oregon State Bar No. 034656

Of Attorneys for Plaintiff

Plaintiff demands Trial by Jury.

DATED this 2nd day of March, 2020.

DEVLIN LAW, P.C.

/s/ John T. Devlin
John T. Devlin
Oregon State Bar No. 042690

LAW OFFICE OF CHAD STAVLEY, P.C.

/s/ Chad Stavley
Oregon State Bar No. 034656

Of Attorneys for Plaintiff