IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


BRENDA KAY NORDENSTROM,
as personal representative for the Estate
of Bryan Perry, Deceased; and
BRENDA KAY NORDENSTROM,
an individual,

        Plaintiff,

    v.

CORIZON HEALTH, INC., a
Tennessee Corporation;
CLACKAMAS COUNTY, an Oregon
County; and individuals JANA RACKLEY,
CAMILLE VALBERG,
NADIA PETROV,
ALEX SALAZAR, M.D.,
SHAWN SHULTZ, BENJAMIN
LEFEVER, MATT SAVAGE, RICKY PAURUS,
LACEY SANDQUIST,
RICHARD TAYLOR, NICK
JOHNSON, MATRONA
SHADRIN, and JOHN DOES
1-10, in their personal capacities.

        Defendants.

No. 3:18-cv-01754-HZ

OPINION & ORDER

William C. Stavley
434 NW 19th Avenue
Portland, OR 97209

John T. Devlin
Devlin Law, P.C.
1212 SE Spokane St.
Portland, OR 97202

Nadia H. Dahab
Sugerman Law Office
707 SW Washington Street, Ste. 600
Portland, OR 97205

John M. Coletti, III
Paulson Coletti
1022 NW Marshall Street, Unit 450
Portland, OR 97209

  Attorneys for Plaintiff

Anne M. Talcott
Kathryn E. Kelly
Stephanie Corey Holmberg
Schwabe Williamson & Wyatt
1211 SW 5th Avenue, Suite 1900
Portland, OR 97258

Scott C. Ciecko
Clackamas County Counsel
Public Services Bldg
2051 Kaen Road
Oregon City, OR 97045

Vicki M. Smith
Bodyfelt Mount, LLP
319 SW Washington Street, Suite 1200
Portland, OR 97204

  Attorneys for Defendant

HERNÁNDEZ, District Judge:

Bryan Perry died while in the custody of Clackamas County on November 3, 2016. His mother, Plaintiff Brenda Nordenstrom, brings claims for inadequate medical care under 42 U.S.C. § 1983 against individual Clackamas County deputies and sergeants, and Corizon Health, Inc. nurses on duty during the time Mr. Perry was in custody as well as their supervisors. Plaintiff also brings *Monell* and negligence claims against Clackamas County (the County) and *Monell*, negligence, and gross negligence claims against Corizon Health, Inc. (Corizon), a private contractor responsible for the provision of medical services at Clackamas County Jail. Defendant Clackamas County moves for summary judgment on all claims against it and the individual Clackamas County Defendants. Defendant Corizon moves for summary judgment on all claims against it and the individual Corizon defendants, except the negligence claim. For the reasons that follow, the Court grants in part and denies in part the parties' motions.

## BACKGROUND

### I.       Mr. Perry's Arrest and Death

On November 3, 2016, the Clackamas County Interagency Taskforce performed a controlled drug buy at Eastport Plaza. Smith Decl. Ex. B 8:24-9:5, ECF 71-1. Mr. Perry and his girlfriend, Ms. Mountsier, happened to be at Eastport Plaza during the buy. *Id.* at 9:13-18. Mr. Perry's parole officer, Officer Kays, was present at the buy and recognized Mr. Perry. *Id.*; Smith Decl. Ex. C 9:15-10:4, ECF 71-2. Officer Kays knew Mr. Perry had an outstanding warrant for a parole violation. *Id.* Mr. Perry was arrested on the outstanding warrant. First Talcott Decl. Ex. 3 at 1, ECF 15.  Ms. Mountsier was also arrested on an outstanding warrant. *Id.*

Officer Fromme volunteered to transport Mr. Perry to the Clackamas County Jail. Smith Decl. Ex. C 8:8-9. Before the ride, he did not notice that Mr. Perry was impaired or intoxicated.

*Id.* at 11:9-10, 12:3-5. Mr. Perry sat in the front seat next to Officer Fromme. *Id.* at 12:8-11. At the beginning of the ride, Mr. Perry asked Officer Fromme to roll down the window because he was hot and had post-traumatic stress disorder. *Id.* at 12:20-25. During the ride, Mr. Perry's demeanor changed. *Id.* at 13:19-21. He began to move around in his seat. *Id.* at 13:22-14:18. When asked by Officer Fromme, Mr. Perry said he was moving around because he was coming down off methamphetamine, was anxious, and did not like to be handcuffed. *Id.* He asked to see a doctor when he arrived to get the medication he needed for his post-traumatic stress disorder. *Id.* at 15:1-11. During the drive, another officer pulled up next to Officer Fromme's vehicle and noted Mr. Perry's body movements and change in demeanor. Smith Decl. Ex. B 14:9-16.

Mr. Perry arrived at the Clackamas County Jail at 7:12 pm. First Talcott Decl. Ex. 3 at 2. He managed to walk on his own from Officer Fromme's patrol car into the jail's intake area. Dahab Decl. Video 1, 0:00-00:24, 01:01-01:07, ECF 94.[1] At intake, his body continued to move and jerk involuntarily requiring the intake officers to retrieve a chair for him to sit in while they searched him. *Id.* at 03:33. During intake, one officer placed his hands on Mr. Perry's shoulders in an apparent effort to steady him, while the other officer continued the pat down. *Id.* at 03:50. Throughout this time, Mr. Perry involuntarily kicked his legs, arched his back, and threw his head back, among other movements. *Id.* at 03:33-05:25. One intake officer described his speech as "barely coherent." Stavley Decl. Ex. R at 10, ECF 95-17. Mr. Perry reported to the officers that he had taken methamphetamines, bath salts, and heroin. *Id.*

Office Shultz conducted Mr. Perry's classification and mental health screeners at intake. First Smith Decl. Ex. F 43:7-18, ECG 71-5. The screeners have 86 questions related to health

---

[1] From this point on, citations to "Video" refer to the videos referenced in the Dahab Declaration available at ECF 94.

and mental health. First Stavley Decl. Ex. O at 13, ECF 95-14. Officer Shultz testified that on busy shifts it is his practice to answer "no" to all the questions on the forms and then later change them to "yes." *Id.* at 46:1-6. On Mr. Perry's form, Officer Shults wrote, "yes" to "Signs of being under the influence of alcohol/drugs" and "Current mental health needs." *Id.* at 13-15. He wrote "no" to all other questions including, "Signs of alcohol/drugs withdrawals/sweating/ needle marks/tremulousness/hallucinations," "Current substance abuse needs," "Current medical problem that nursing needs to be aware of (ie, Diabetes)," "Needs to be seen by a nurse," and "Under the influence of drugs/alcohol." *Id.* Sergeant Taylor signed off on the screening forms. *Id.* at 3.

After the intake process, multiple officers assisted Mr. Perry to a padded high-security cell around 7:20 pm. Video 2; First Smith Decl. Ex. H 17:17-20, ECF 71-7. Mr. Perry continued to exhibit uncontrollable body movements including clutching at his head and stomach. Video 3. At 7:40 pm, a group of four deputies gathered outside Mr. Perry's cell observing him and making comments to one and other. Video 4, 00:47-03:10. Deputy Shadrin took a video of Mr. Perry on her cell phone. Video 5. The video captures Mr. Perry moaning, yelling, writhing, and twisting his body uncontrollably. *Id.* It also recorded the following conversation between the deputies observing Mr. Perry.

> Deputy Sandquist: "You don't think this needs to, like, go to the school as, like, the new DARE?"
> Deputy James Murphy: "Can we just take him and put him in front of a class?"
> Deputy Sandquist: "That would be fantastic."
> Deputy Paurus: "And you can just wheel him in in a cage and wheel him back out."
> Deputy Sandquist: "Oh my god, what is that?"
> Deputy Sandquist: "Just let him sit there for like 10 minutes, and then 'Don't do drugs,' and then wheel him back out. That's it."
> Deputy Paurus: "You'd be like, look what I brought for show and tell today."
> Deputy Sandquist: "Yeah and then one kid, 'That's my dad.'"
> Deputy Paurus: "That's awful. I mean, that's absolutely awful."

Deputy Shadrin: "There's no face shots. You should go show this to his girlfriend, like, 'You love this?'"

*Id.* 5:00–52.

At some point prior to 7:48 pm, Sergeant Taylor told Nurse Rackley that Mr. Perry needed to be seen. Smith Decl. Ex. O 74:5-10, ECF 71-12. Sergeant Taylor was the booking sergeant on duty at that time. Smith Decl. Ex. E at 7, ECF 71-4. During this conversation Sergeant Taylor and Nurse Rackley observed Mr. Perry from outside the cell and then went to get Ms. Mountsier to attempt to learn what drugs Mr. Perry had taken. First Talcott Decl. Ex. 3 at 13; Smith Decl. Ex. O 74:14-75:2.

At 7:55 pm, Nurse Rackley entered Mr. Perry's cell to examine him. Video 6. Prior to her entry, the video shows Mr. Perry continuing to writhe uncontrollably on the floor of the cell. *Id.* Four deputies restrained him while Nurse Rackley attempted to take his vital signs. *Id.* Nurse Rackley obtained his heart rate (86), body temperature (98.6 degrees), and blood oxygen saturation (91%). First Talcott Decl. Ex. 8, ECF 69-2. She did not obtain his blood pressure. First Talcott Decl. Ex. 6 104:12–17, ECF 68-6. In her chart note, recorded forty-five minutes after she took Mr. Perry's vitals, Nurse Rackley wrote that Mr. Perry was "visibly out of control, flopping all over" and that he was "clearly out of breath and breathing rapidly." First Talcott Decl. Ex. 8. She noted that she planned to reassess him in an hour. *Id.*

Deputies started a water log for Mr. Perry and brought him a cup of water. Stavley Decl. Ex. J at 13, ECF 95-9. Over the next hour, deputies conducted six visual checks on Mr. Perry and nursing staff conducted one. First Talcott Decl. Ex. 3 at 3.

At 9:17 pm, Nurse Rackley conducted her second examination of Mr. Perry. Video 8 at 01:03. She took Mr. Perry's vital signs, including his blood pressure, and appeared to document the readings on her arm. *Id.* at 02:50, 03:11. Nurse Rackley did not record her notes from this

visit for two days. First Talcott Decl. Ex. 9, ECF 69-3. She recorded his blood pressure as 90/52, heartrate as 97, and oxygen saturation as 91-92%. *Id.* She noted that he was responding better both physically and cognitively. *Id.* The video shows Mr. Perry's movements slowing down at this point. Video 8. He sits on the bench, hunched forward grabbing at his arms, legs, and head while rocking back and forth. *Id.*

Over the next two hours, deputies conducted eight visual checks on Mr. Perry and nursing staff conducted three. First Talcott Decl. Ex. 3 at 3. The visual checks conducted throughout the night lasted anywhere from half a second to ten seconds. Video 11.

At the end of her shift, Nurse Rackley informed the on-coming nurse, Nurse Valberg, that she should see Mr. Perry in one hour. First Talcott Decl. Ex. 10 74:20–22, ECF 15. She also told her that he was stable and improving. *Id.* at 75:6–9.

At 11:17 pm, Nurse Valberg entered Mr. Perry's cell to examine him. Video 10. The video shows Mr. Perry lying on his back and moving his mouth. *Id.* at 00:02. A deputy then moved him into a seated position which he could not maintain on his own. *Id.* at 00:16 Mr. Perry was then slumped against the wall with his chin resting on his chest. Nurse Valberg examined him while he was in this position. *Id.* at 02:30-03:35. Mr. Perry appears to stop moving during Nurse Valberg's examination. *Id.* A deputy stated that at this point Mr. Perry's "breath started slowing" and that he "was foaming at the mouth." Stavley Decl. Ex. R at 10, ECF 95-17. After a minute of trying to get Mr. Perry's blood pressure using a manual cuff, Nurse Valberg left the cell. Video 10 at 03:35. Mr. Perry remained motionless. *Id.* The deputies in the cell then moved Mr. Perry's body so that it was lying flat on the bench in the cell. *Id.* at 03:50. Nurse Valberg returned with an automated blood pressure cuff. *Id.* at 4:06. According to a deputy in the cell, at this point, "it appeared his breathing had stopped." Stavley Decl. Ex. R at 10.  Nurse Valberg

used the automated blood pressure cuff to attempt to take Mr. Perry's blood pressure, and then began to rub Mr. Perry's chest with one hand. Video 10, 04:50. Before this, a deputy asked Nurse Valberg if they should start CPR and get the AED. Stavley Decl. Ex. R at 10. Mr. Perry did not move his body this entire time. *Id.* At 11:23, No lifesaving measures were initiated in the intervening two minutes and ten seconds.

AED pads were then placed on Mr. Perry's chest. Video 10, 06:09. At 11:23:34, the deputies re-positioned the AED pads on Mr. Perry's chest. *Id.* at 06:36. At 11:23:51, a deputy began chest compressions. *Id.* at 06:53. It then appears that Nurse Valberg instructed the deputy to stop compressions as she looked at the AED. *Id.* at 07:10. At 11:24:25 Nurse Valberg left the cell, and the deputies began CPR. *Id.* at 07:27. At 11:30, Clackamas Fire arrived and took over CPR. First Talcott Decl. Ex. 3 at 4. Mr. Perry was then transported to the hospital where he was declared dead. *Id.*; First Talcott Decl. Ex. 11, ECF 68-10.

## II.    Clackamas County's Relationship to Corizon

In 2011, the County contracted with Corizon to provide health care in the Jail. Am. Compl. ¶ 21. The County and Corizon signed a Renewal Health Services Agreement in August 2015 with a term through June 30, 2018. Smith Decl. Ex. A at 5, 16, ECF 75-1. The parties' original contract required Corizon to comply with National Commission on Correctional Health Care (NCCHC) standards. Supp. Stavley Decl. Ex. A at 59:22-60:9, ECF 96-1. In 2014, the parties amended the Agreement so that Corizon was no longer required to comply with NCCHC standards for staffing. Supp. Stavley Decl. Ex. A at 61:5-9; *Id.* at 69. Clackamas County also testified that issues with intake screening prevented Corizon from meeting the requirements of NCCHA. *Id.* at 60:17-22. At some point prior to 2016, Corizon made a request to Clackamas

County for more nursing staff to address workload issues with intake. *Id.* at 62:18-63:14. Clackamas County denied the request. *Id.*

## III. Corizon's Intake/Receiving Screening Process

Corizon staff are to conduct intake/receiving screenings on all inmates booked into the jail. Talcott Reply Decl. Ex. 11 at 1, ECF 105. The screening is meant to be "a comprehensive assessment and medical history to identify and address emergent, urgent, and chronic health needs of an incoming inmate to the jail." Def. Corizon Am. Reply at 11. Corizon relies on its General Health Services Policy & Procedure J-E-02.00 (Health Services Policy) and its Core Process Program module on Intake/Receiving Screenings to train its employees on intake screening. Talcott Reply Decl. Exs. 4, 6. The Health Services Policy incorporates NCCHC standards. Talcott Reply Decl. Ex. 6 at 1. The Health Services Policy states that "Persons who are . . . severely intoxicated, in alcohol or drug withdrawal or otherwise urgently in need of medical attention are: a. Referred immediately for care and medical clearance into the facility." *Id.* It also requires that intake screenings be "performed on inmates upon arrival" and "prior to the patient being housed in the facility." *Id.* at 1, 3. Clackamas County and Corizon's Health Services Agreement states that "[a]ll individuals brought into the Facility shall be given a receiving screening by Corizon Health personnel within four (4) hours of admission to the Facility." Talcott Reply Decl. Ex. 11 at 1.

Corizon has "Fit for Confinement Guidelines" specific to Clackamas County Jail. Stavley Decl. Ex. B at 12, ECF 95-1. The Guidelines are meant to identify "health conditions that may require medical clearance by a physician _prior_ to the individual's acceptance into the Clackamas County Jail." *Id.* (emphasis in original). "[I]mpairment with alcohol or illicit substances rendering the individual incoherent, confused, or unable to stand or walk without assistance" is

given as an example of a condition that "may require medical clearance prior to booking." *Id.* Corizon does not dispute that Mr. Perry did not receive an intake/receiving screening from Corizon staff on the night in question.

## IV.    Clackamas County's Role in Intake Screening

As discussed above, Clackamas County Jail staff complete classification and mental health screeners when an inmate gets booked into the jail. Stavley Decl. Ex. E 28:10-17, ECF 95-4. This is the first step in evaluating whether an inmate can be confined at the jail. *Id.* at 29:9-13; Stavley Decl. Ex. B 54:24-55:2; Ex. F 56:14-57:4, ECF 95-5. If a deputy is unsure if an inmate is fit for confinement, they are to have medical staff come look at them. Stavley Decl. Ex. E 29:19-30:12. Corizon and Clackamas County had a document showing that Corizon was supposed to provide health related training to staff at the Clackamas County Jail titled, "Health Training for Correctional Officers" "Site Name: Clackamas County Jail." Stavley Decl. Ex. E at 77. The procedure states that "at a minimum" jail staff should be trained in how to recognize "acute manifestations of . . . intoxication and withdrawal." Stavley Decl. Ex. E at 77. Clackamas County testified that Corizon never trained its deputies on the Fit for Confinement policies and that it also did not provide medical training to its staff on whether an inmate was fit to confine. Supp. Stavley Decl. Ex. A Eby Dep. 12:9-13:16. Clackamas County staff were trained to look for situations where it would be appropriate to get medical involved to do an assessment of the inmate to determine whether they needed further medical help. *Id.* at 15:32-16:2.

## V.    Training Related to the Toxicities of Methamphetamines and Bath Salts

### A.    Corizon

Corizon's Regional Director of Nursing testified that Corizon was aware of the dangers of bath salts before 2016. Stavley Decl. Ex. B 28:24-29:4. She also testified that she was

unaware of any Corizon policy or procedure on methamphetamine intoxication or withdrawal but that she did remember that she had seen a protocol that had the word methamphetamine. *Id.* at 29:5-25. Corizon's Regional Medical Director testified that medical staff in the jail, "should be trained about the effects of methamphetamine and bath salts, and they should be aware of it, and should know what signs and symptoms to look for." Stavley Decl. Ex. D 36:21-24, ECF 95-3. He also stated that he was unaware of a company wide policy on the hazards of bath salts. *Id.* at 80:16-19. Nurses Rackley, Valberg, Petrov, and Cronin all testified that they either did not receive or did not remember receiving training on the dangers of bath salts. Stavley Decl. Ex. F 140:23-25; Ex. G 166:11-23, ECF 95-6; Ex. E 89:18-23; Ex. C 53:13-16, ECF 95-2. Nurse Cronin testified that she did not remember receiving training on methamphetamine overdose and withdrawal. Stavley Decl. Ex. C 53:8-12.

In 2016, Corizon's clinical standard operating procedures on substance abuse withdrawal provided specific direction on alcohol, opioids, and benzodiazepines, but did not provide direction on methamphetamine or bath salts. Stavley Decl. Ex. D at 13-21. It did provide general guidance on identifying common signs and symptoms of withdrawal, some of which matched Mr. Perry's presentation. *Id.*

In 2013, Corizon developed a briefing for correctional officers on the danger of bath salts. Stavley Decl. Ex. A at 16. It describes the risks of bath salts and states that "[t]he risk of overdose is very high," and "[m]any people have died from using bath salts." *Id.* It appears that Clackamas County had this briefing in its possession in 2018, two years after Mr. Perry's death. *Id.* at 15.

//

//

### B. Clackamas County

Sergeant Johnson testified that in 2016 it was becoming increasingly common for inmates to say that they had taken both bath salts and methamphetamine. Stavley Decl. Ex. J 50:11-15. Other jail staff testified that they often encountered people on methamphetamine and to some extent bath salts. Stavley Decl. Ex. I 12:22-1, 23:11-12, ECF 95-8; Ex. M 9:12-16, ECF 95-12.

Multiple jail staff confirmed that Clackamas County provides training on intoxication generally but did not recall any training specific to methamphetamine or bath salts. Stavley Decl. Ex. A 27:12-18; Ex. I 23:16-23; Ex. L 11:1-10, ECF 95-11; Ex. R 10:5-9, ECF 95-17. Deputy Shultz testified that he received training on methamphetamine and withdrawal but could not remember specific training on bath salts. Stavley Decl. Ex. O 12:2-13:3. Sergeant Johnson testified that he received training that methamphetamine intoxication can be life threatening. Stavley Decl. Ex. J 15:17-22.

## EVIDENTIARY OBJECTIONS

Defendant Clackamas County moves to exclude or strike portions of Plaintiff's expert declarations. The Court relies on Plaintiff's expert declarations sparingly and does not consider the evidence Defendant Clackamas County objects to in determining whether Plaintiff has raised a question of fact concerning Defendant's conduct. The Court thus declines to rule on whether this evidence is admissible for proving Plaintiff's claims or should be stricken as prejudicial and unhelpful.

Plaintiff moves to strike as inadmissible the Clackamas County Individual Defendant's Declaration of Gretchen Miller. Similarly, the Court does not consider this Declaration in making its findings and declines to rule on its admissibility at this time.

//

## STANDARDS

## I.    Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## II.    Qualified Immunity

The Individual Clackamas County Defendants have raised the defense of qualified immunity. A defendant is entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald¸* 457 U.S. 800, 818 (1982). The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne,* 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009).

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks and citation

omitted, emphasis in original). Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003). The official is still entitled to qualified immunity if the official "could have believed, 'reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right.'" *Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).

## DISCUSSION

Defendant Clackamas County and the Clackamas County Individual Defendants move for summary judgment on all claims against them. Corizon and the Corizon Individual Defendants move for summary judgment on all claims against them except negligence. The Court begins with Plaintiff's § 1983 claims and examines them in three parts: (1) Plaintiff's personal liability claims against Clackamas County Individual Defendants and Corizon Individual Defendants; (2) Plaintiff's *Monell* liability claims against Clackamas County and Corizon; and (3) Plaintiff's supervisory liability claims against Corizon Individual Defendants Nurse Petrov and Dr. Salazar. The Court then turns to Plaintiff's state law claims.

## I.      Plaintiff's § 1983 Claims for Inadequate Medical Care

Plaintiff contends that the conduct of Clackamas County Deputies Shultz, Paurus, Sandquist, and Shadrin and Sergeants Taylor and Johnson and the conduct of Corizon nurses Rackley and Valberg constituted inadequate medical care in violation of the Eighth or Fourteenth

Amendment. All Defendants seek summary judgment on the merits of these claims, and the Clackamas County Individual Defendants assert a defense of qualified immunity.

As a threshold matter the Court must decide whether the Eighth or Fourteenth Amendment applies to Plaintiff's § 1983 claims. "Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016) (citations omitted).

Plaintiff argues that the Fourteenth Amendment applies to her claims because Mr. Perry was in custody on a parole violation that had yet to be adjudicated when he died and was thus akin to a pretrial detainee. Defendants argue that Mr. Perry's sentence to a term of incarceration and parole included incarceration pending further hearings should a Board warrant be issued. They thus argue that his incarceration on the night he died was a component of his original sentence and "thus a component of his punishment for crimes of which he was duly convicted."[2] Corizon Am. Reply at 8, ECF 104.

The Court concludes that the Eighth Amendment applies to Plaintiff's claims. Mr. Perry was in custody on the night in question because of his original conviction and sentence. He committed no other alleged crime. Thus, "[h]is original conviction is the authority under which he was confined after his parole violation" and supplied the basis for his punishment. *Flores v. Mesenbourg*, No. 95-17241, 1997 WL 303277, at *1 (9th Cir. June 2, 1997) (unpublished opinion). As a "convicted prisoner" the Eighth Amendment applies to his claim. *Id.; see also*

---

[2] In their briefing the parties use the term parole. The Court notes that the record does not establish whether Mr. Perry was arrested on a parole violation or a violation of a condition of post-prison supervision.

*Flores v. Cty. of Fresno*, No. 119CV01477DADBAM, 2020 WL 4339825, at *3 (E.D. Cal. July 28, 2020); *Jensen v. Cty. of Los Angeles*, No. CV1601590CJCRAO, 2017 WL 10574058, at *7 (C.D. Cal. Jan. 6, 2017); *Clarke v. Okafor*, No. CV 11-6129-FMO RNB, 2014 WL 2039440, at *8 (C.D. Cal. May 9, 2014) (finding the same).

The government has an "obligation to provide medical care for those whom it is punishing by incarceration" and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must first "objectively show that he was deprived of something 'sufficiently serious.'" *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "A deprivation is sufficiently serious when the prison official's act or omission results 'in the denial of the minimal civilized measure of life's necessities.'" *Id.*

Next, the plaintiff must show that the defendant's response to the need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted)."To satisfy this subjective component of deliberate indifference, the inmate must show that prison officials 'kn[e]w [ ] of and disregard[ed]' the substantial risk of harm, but the officials need not have intended any harm to befall the inmate; 'it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting *Farmer*, 511 U.S. at 837). "[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. Cty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (citing *Farmer*, 511 U.S. at 842).

Finally, plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries. *Lemire*, 726 F.3d at 1074.

### A.      Individual Clackamas County Defendants

Plaintiff brings Eighth Amendment claims for inadequate medical care against Deputies Shultz, Paurus, Sandquist, and Shadrin and Sergeants Taylor and Johnson.[3] All Defendants seek summary judgment on the merits of the claims and assert a defense of qualified immunity.

### i.      Deputy Shultz

Plaintiff asserts that by allowing Mr. Perry to be admitted to the jail, Deputy Shultz acted in reckless disregard of his right to adequate medical care while in custody. Defendant Shultz argues that he was not subjectively aware of the risk of serious harm to Mr. Perry and that he did not cause Mr. Perry's death.

It is undisputed that Deputy Shultz failed to accurately complete the intake screener. *See, e.g.*, Smith Decl. Ex. F at 48:3–18. To prevail, however, Plaintiff must provide evidence that Deputy Shultz's conduct was the actual and proximate cause of Mr. Perry's death. Plaintiff has not made such a showing. "Traditional tort law defines intervening causes that break the chain of proximate causation." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citing Prosser and Keeton on Torts § 44, at 312 (5th ed.1984)). The Ninth Circuit applies this analysis to § 1983 actions. *Id.*

Despite Deputy Shultz's lack of care in completing the intake screener, Sergeant Taylor, the booking Sergeant on duty, ensured medical staff saw Mr. Perry. Consequently, medical staff

---

[3] Plaintiff conceded her claims against Deputy Lefever and Deputy Savage. Oral Arg. Tr. 61:9-12.

did not rely on the inaccurate intake form to triage Mr. Perry, and it did not prevent medical staff from evaluating him. Therefore, Sergeant Taylor ensuring medical staff visited Mr. Perry was a superseding intervening cause that broke the chain of causation for Deputy Shultz and relieves him of liability under the Eighth Amendment. The Court grants Deputy Shultz summary judgment on the claim against him.

### ii.    Deputies Paurus, Sandquist, and Shadrin

Plaintiff argues that Deputies Paurus, Sandquist, and Shadrin were deliberately indifferent to Mr. Perry's serious medical needs. Defendants argue that they did not have subjective knowledge of the risk to Mr. Perry, were not deliberately indifferent, and were not the cause of Mr. Perry's death.

The record suggests that there is at least a question of fact as to whether these deputies had the requisite knowledge and were deliberately indifferent to Mr. Perry's serious medical needs. Deputies Paurus, Sandquist, and Shadrin stood by and watched Mr. Perry amid an obvious medical crisis. In the video he can be seen writhing around his cell, moaning, and calling out at points. The conversation between the deputies shows that they were subjectively aware of the exceptional nature of his condition and risks to his health. Deputy Shadrin also observed Mr. Perry near the time he was arrested and noted the significant change in his condition. Stavely Decl. Ex. N 11:7-24. She testified that his behavior was bizarre and unlike anything she had seen before in Multnomah and Washington County. *Id.*

Despite this awareness, the deputies did not take measures to ensure Mr. Perry was safe and nothing in the record suggests that they failed to act because they already knew that medical help was on the way.

There is no way to know if an early intervention on the part of these deputies could have saved Mr. Perry's life. However, failing to act can be enough to establish causation. The Ninth Circuit has held that "direct causation by affirmative action is not necessary: 'a prison official may be held liable under the Eighth Amendment if he knows that inmates face a substantial risk of serious harm and disregards that risk *by failing to take reasonable measures to abate it*.'" *Castro*, 833 F.3d at 1067 (quoting *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (ellipsis omitted) (emphasis in original). Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Deputies Paurus, Sandquist, and Shadrin were aware of the serious risk to Mr. Perry's life and failed to take reasonable measures to abate it. The Court denies Deputies Paurus, Sandquist, and Shadrin summary judgment on the claims against them.

### iii. Sergeants Taylor and Johnson

Plaintiff argues Sergeants Taylor and Johnson were deliberately indifferent to Mr. Perry's serious medical needs. Defendants argue that there is no evidence that they were subjectively aware of the risk to Mr. Perry's serious medical needs or that they chose to consciously disregard that risk.

Sergeant Taylor observed Mr. Perry in-person when Officer Fromme brought him into the jail. Smith Decl. Ex. E 38:2-7. Sergeant Taylor also signed off on the inaccurate intake screener conducted by Officer Shultz. However, from that point on, Sergeant Taylor worked to ensure that medical staff attended to Mr. Perry. Sergeant Taylor sought out Nurse Rackley and asked her to evaluate Mr. Perry. He then went with her to speak with Ms. Mountsier to learn more about what drugs Mr. Perry had consumed. Sergeant Taylor also started a water log for Mr. Perry.

Sergeant Johnson also worked to ensure Mr. Perry was evaluated by medical staff. Sergeant Johnson first observed Mr. Perry at in take over the Jail's video monitoring system. Smith Decl. Ex. E at 7. After Ms. Mountsier's condition deteriorated and she was transferred to a hospital, Sergeant Johnson went to Nurse Rackley and asked her to check on Mr. Perry again. *Id.* at 8. Nurse Rackley reported to Sergeant Johnson that Mr. Perry appeared to be improving. *Id.* Once the nurses changed shifts, Sergeant Johnson went to Nurse Valberg to verify that she was aware of Mr. Perry's condition and planned to do another check on him. *Id.* He also checked on Mr. Perry personally at least twice during the late evening. *Id.*

The record suggests that Sergeants Taylor and Johnson were aware Mr. Perry was at risk of having a serious medical emergency and were concerned that his condition could deteriorate but repeatedly deferred to medical staff. This is not a case in which the inmate was left to languish alone in his cell. Rather, Sergeants Taylor and Johnson put in place a system to monitor Mr. Perry and relied on the opinion of the Jail's medical provider. Whether that reliance was objectively reasonable or constituted negligence is a question the jury will need to answer. But, for an Eighth Amendment claim, Plaintiff's evidence is insufficient to create a question of fact as to whether Sergeants Taylor and Johnson were deliberately indifferent to Mr. Perry's serious medical needs. The Court grants Individual Defendants Taylor and Johnson summary judgment on the claims against them.

### iv.     Qualified Immunity

As discussed above, the Court finds that Plaintiff has created a question of fact as to whether Deputies Paurus, Sandquist, and Shadrin violated Mr. Perry's Eighth Amendment rights. For the purposes of the qualified immunity analysis, the Court will consider whether the right at issue here was clearly established on November 3, 2016. "To determine whether [an officer]

violated clearly established law, we look to cases relevant to the situation [the officer] confronted, mindful that there need not be a case directly on point." *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (internal quotation marks and citation omitted). And, while there need not be a case directly on point, "existing precedent must place the lawfulness of the particular [action] beyond debate," for which "a body of relevant case law is usually necessary." *City of Escondido v. Emmons*, ___U.S.___, 139 S. Ct. 500, 504 (2019) (internal quotation marks and citation omitted). This is "an objective examination of whether established case law would make clear to every reasonable official that the defendant's *conduct* was unlawful in the situation he confronted." *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 678 (9th Cir. 2021) (citing *Horton*, 915 F.3d at 600–602) (emphasis in original).

To defeat qualified immunity, Plaintiff must show that, given the case law available at the time, a reasonable jail deputy, knowing what these three deputies knew, would have understood that failing to ensure Mr. Perry had adequate medical care "presented such a substantial risk of harm to [Mr. Perry] that the failure to act was unconstitutional." *Id.* (citing *Horton*, 915 F.3d at 600). Before 2016, it was "clearly established that officers could not intentionally deny or delay access to medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Estelle*, 429 U.S. at 104–05). The Ninth Circuit recently analyzed cases, all decided before 2016, where prison officials denied, delayed, or intentionally interfered with needed medical treatment. *Sandoval*, 985 F.3d at 680.  It synthesized the rule from these cases as follows: "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the

Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Id.*[4]

Viewing the evidence in the light most favorable to Plaintiff, the Deputies knew Mr. Perry was experiencing an exceptional reaction to a dangerous mixture of illicit drugs but failed to summon medical help or ensure medical help was already on the way. While Plaintiff does not cite a case addressing the specific factual circumstances of this case, the deputies are not entitled to qualified immunity. "State officials can still be on notice that their conduct violates established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." *Sandoval*, 985 F.3d at 680 (quoting *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020)). The delay and denial of medical care here fell within the category of conduct prohibited by *Clement v. Gomez* and its progeny. Indeed, the Ninth Circuit has found violations in less severe circumstances. *See, e.g.*, *Jett*, 439 F.3d at 1097–98 (finding a constitutional violation where a prison doctor failed to set an inmate's fractured thumb); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (finding a constitutional violation where prison officials failed to treat the plaintiff's broken teeth and bleeding gums). A reasonable jail deputy under the circumstances would have known that standing idly by and not calling for medical help or ensuring medical help was on the way would amount to "an unconstitutional failure to provide 'life-saving measures to an inmate in obvious need.'" *Sandoval*, 985 F.3d at 679. Deputies Paurus, Sandquist, and Shadrin are not entitled to qualified immunity.

//

---

[4] *Sandoval* was decided after the incident at issue here. 985 F.3d 657. The Court does not rely on the facts in *Sandoval* but on the Ninth Circuit's analysis of cases decided before Mr. Perry's death discussed therein.

**B. Individual Corizon Defendants**

The Individual Corizon Defendants, Nurse Rackley and Nurse Valberg, do not concede that Mr. Perry had a sufficiently serious medical need. They also argue that they were not subjectively aware of the risk to Mr. Perry's health and did not act with deliberate indifference.[5]

**i. Sufficiently Serious Medical Need**

To prevail on an Eighth Amendment claim, a plaintiff must objectively show that the prisoner had a medical need that was "sufficiently serious." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). Based on the video evidence alone, the Court finds that Plaintiff creates a question of fact as to whether Mr. Perry suffered from an objectively serious medical need while he was held in the Clackamas County Jail. Failure to treat his condition likely resulted in his death and Mr. Perry's physicality and vocalizations in the videos at least create a question of fact as to whether he was suffering and in pain.

**ii. Nurse Rackley**

Plaintiff presents evidence that creates a question of fact regarding whether Nurse Rackley had the requisite knowledge of a substantial risk of harm to Mr. Perry's life and acted with deliberate indifference to that risk. Nurse Rackley knew Mr. Perry had taken methamphetamines, bath salts, and heroin. She knew Mr. Perry's oxygen saturation levels at both checks were below normal, described by one of Plaintiff's experts as "extremely troubling."

---

[5]The Individual Corizon Defendants do not assert a defense of qualified immunity.

Webster Decl. at 4. Her chart note shows that she was aware that Mr. Perry was breathing rapidly and was out of breath. Stavley Decl. Ex. F at 18.  Nurse Rackley testified that these findings were "normal" because of his body movements. First Talcott Decl. Ex. 6 120:20-121:5. Yet, those same body movements, according to her testimony, prevented Nurse Rackley from obtaining a full set of vitals. Rather than escalate the situation when she was unable to obtain critical vitals, Nurse Rackley left Mr. Perry alone and planned to re-check him later. At the second check, Nurse Rackley obtained Mr. Perry's blood pressure which was abnormal. Webster Decl. at 4; Baines Decl. at 13; Thiessen Decl. at 4; Radecki Decl. at 11-12. She did not record her chart note from this visit for over two days. Stavley Decl. Ex. F at 19.

In explaining her failure to seek a higher level of medical care for Mr. Perry, Nurse Rackely relies heavily on her testimony that Mr. Perry's presentation was normal and consistent with other intoxicated inmates she had treated. First Talcott Decl. Ex. 6 at 51:22-52:2. Plaintiff proffers evidence that creates a question of fact as to whether the severity of Mr. Perry's uncontrollable body movements and condition generally was exceptional even for someone experiencing methamphetamine intoxication.

There is video evidence of Mr. Perry's entire time in the cell. The video shows Mr. Perry thrashing and writhing around the cell, he appears to be in obvious medical distress. His uncontrollable movements were so severe that jail staff put him in a padded cell, had to remove his pants, and had to pin him down to attempt to obtain his vitals. While some deputies testified that his condition was normal, others testified that they had not seen anyone in this condition previously. A group of four deputies gathered outside his cell to watch and film Mr. Perry suggesting his presentation was noteworthy. Sergeants Taylor and Johnson's actions also show that they found his condition concerning and in need of medical attention. Plaintiff also presents

declarations from experts familiar with methamphetamine intoxication who observed the video and concluded that Mr. Perry's presentation was abnormal. Webster Decl. at 4; Baines Decl. at 12; Roscoe Decl. at 10.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Mr. Perry had an objectively serious medical need, that Nurse Rackley had subjective knowledge of that need based on the information she obtained or failed to obtain in her assessments and his obvious physical presentation, and that she acted with deliberate indifference when she failed to seek a higher level of care for Mr. Perry. Given that Nurse Rackley was the medical provider charged with evaluating Mr. Perry, Plaintiff also creates a question of fact as to whether Nurse Rackley's actions were a direct cause of Mr. Perry's death. The Court denies Nurse Rackley summary judgment on Plaintiff's § 1983 claim against her.

### iii. Nurse Valberg

Plaintiff creates a question of fact as to whether Nurse Valberg had the requisite knowledge and was deliberately indifferent to Mr. Perry's life and serious medical needs. Nurse Valberg made the decision to send Ms. Mountsier to the emergency room. She knew Mr. Perry had taken a similar mixture of drugs and was exhibiting similar symptoms to Ms. Mountsier. Still, she did not call the ER to get a report on Ms. Mountsier's condition after she was transferred out of the jail.

Nurse Valberg conducted her assessment of Mr. Perry around 11 pm. There is video evidence of the entire assessment. In her late entry chart note, Nurse Valberg said that Mr. Perry sat up on his own at the start of her visit, but the video shows two deputies lifting Mr. Perry into a seated slumped position. Nurse Valberg attempted to check his blood pressure while he was in this position. During this check Mr. Perry stopped moving. A deputy in the cell stated at this

point Mr. Perry's "breath started slowing" and that he "was foaming at the mouth." Stavley Decl. Ex. R at 10, ECF 95-17. Nurse Valberg did not begin life saving measures at this point but left the cell to retrieve an automatic blood pressure cuff. When she returned, Mr. Perry was still motionless lying flat on his back. Again, rather than check his vitals or call for emergency help, Nurse Valberg attempted to use the automated blood pressure machine on Mr. Perry. At the suggestion of a deputy, Nurse Valberg then attempted to use an AED. She delayed CPR while she waited for it to work properly. Deputy Savage, who was in cell during the assessment testified that in this time the "color left his body" and "he turned to a gray, kind of ashy color." Stavley Decl. Ex. M 25:12-15. In the incident report, Sergeant Johnson wrote that when he arrived in the cell, around when Nurse Valberg was waiting for the AED to work, "Mr. Perry was ashy colored and was not breathing on his own that I could tell." Smith Decl. Ex. E. at 9. At the apparent direction of Nurse Valberg, jail staff did not begin sustained CPR or call 911 until approximately 5 minutes after Mr. Perry appears to stop moving in the video.

Plaintiff presents significant expert testimony that this course of treatment was medically unacceptable. Roscoe Decl. at 10; Thiessen Decl. at 7; Radecki Decl. at 10; Webster Decl. at 3, 6. The Court finds that the very obviousness of the risk creates a question of fact as to whether Nurse Valberg knew of the excessive risk to Mr. Perry's life and chose this course of action in conscious disregard of that risk.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Nurse Valberg's inaction during what appeared to be an obvious medical emergency amounted to deliberate indifference. The Court denies Nurse Valberg summary judgment on Plaintiff's § 1983 claim against her.

//

### C.     *Monell* Claims

Plaintiff alleges several *Monell* claims against Clackamas County and Corizon.

To prevail on a municipal liability claim under § 1983, Plaintiffs must show that a municipal custom or policy caused the violation of their constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that a municipality is a "person" subject to liability under § 1983 when it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). The Supreme Court made clear that the municipality itself must cause the constitutional deprivation and that a city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior. *Id.*; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). The Ninth Circuit has held a plaintiff may establish municipal liability under *Monell* in one of three ways: (1) the officer "committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity," (2) "the individual who committed the constitutional tort was an official with final policy-making authority," or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (citations omitted).

The Court has found that a question of fact remains as to whether a constitutional violation occurred, so the Court analyzes each of the avenues through which Plaintiff alleges *Monell* liability against Clackamas County and Corizon to determine whether they are entitled to summary judgment on Plaintiff's *Monell* claims.

### i.      Allegations and Theories Not in Plaintiff's Amended Complaint

As a preliminary matter, the Court must determine which of Plaintiff's alleged policies it can properly consider on these motions. Plaintiff's Amended Complaint alleges eight policies, customs, or practices that were the moving force behind Mr. Perry's death. In her response to Clackamas County and Corizon's motions for summary judgment, Plaintiff abandons some of those alleged policies and advances new ones, along with a new *Monell* theory of ratification. Although some of these alleged policies may be simple reframing or refinements of earlier allegations, the County objects that others, particularly those that allege ratification by Clackamas County of Corizon's conduct, amount to new theories not alleged in the Amended Complaint. The County contends that the Court should confine Plaintiff to the allegations in the Amended Complaint.

It is well-established that "summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc., v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation and internal quotations omitted); *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (where "the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court"). In her response to Clackamas County, Plaintiff alleges the County had a policy, practice, or custom of "[f]ailing to conduct death investigations in accordance with NCCHC standards." Pl. Resp. at 29-30, ECF 77. Her Amended Complaint does not reference post-death investigations. Similarly, her Amended Complaint does not discuss or advance a theory of ratification on the part of Clackamas County. Accordingly, the Court will not consider these avenues for *Monell* liability.

Clackamas County also asks the Court to disregard Plaintiff's claims related to training on the toxicities of methamphetamines and bath salts and a culture of indifference to the rights of inmates. While not identical to any allegations in the Amended Complaint, the Court finds these are sufficiently similar or a narrowing of policies, customs, and practices Plaintiff did allege in her Amended Complaint and will consider them as bases for *Monell* liability.

### ii.      Failure to Train

Plaintiff advances two failure to train theories for *Monell* liability. First, Plaintiff alleges that despite having policies that required it to do so, Corizon had a custom or practice of failing to train its own staff and Clackamas County staff on how to properly conduct intake screenings. She also alleges that Clackamas County had a custom or practice of not training staff on how to properly conduct intake screenings. Second, Plaintiff alleges that Clackamas County and Corizon had a custom or practice of failing to train staff on the toxicities of methamphetamines and bath salts.

*Monell* liability can arise from a failure to train, supervise, or discipline that amounts to an official policy of deliberate indifference to an individual's constitutional rights. *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). Clackamas County and Corizon may be liable on a failure to train or supervise theory when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 388–89. To demonstrate a municipality's deliberate indifference to its inadequate training program, the plaintiff usually must show a pattern of similar constitutional violations caused by inadequate training. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "A municipality's culpability

for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61 (citing *Tuttle*, 471 U.S. at 822–23).

Though generally insufficient, a single instance of a violation can support a *Monell* claim. *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021). In these "rare" cases, a "showing of 'obviousness' can substitute for the pattern of violations ordinarily necessary to establish municipal culpability." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (quoting *Connick*, 563 U.S. at 63). "'[T]he unconstitutional consequences of failing to train' must be 'patently obvious' and the violation of a protected right must be a 'highly predictable consequence' of the decision not to train." *Id.*; *see City of Canton*, 489 U.S. at 390 (providing that where a "city has armed its officers with firearms[,] . . . the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as deliberate indifference to constitutional rights.").

### a. Proper Intake Screenings

Plaintiff presents the following evidence on her failure to train theory related to intake screening. Corizon did not train Clackamas County staff on the Fit for Confinement guidelines and Clackamas County did not train staff itself on what to look for medically when determining whether someone was fit to confine. Plaintiff argues that this occurred despite the fact that Clackamas County Jail staff conduct the first intake screening and make the initial fit for confinement decision without medical staff present.

Plaintiff can establish deliberate indifference on a failure to train theory only if Corizon and Clackamas County knew that their training was constitutionally inadequate and continued to not train staff despite the known or obvious risk that constitutional violations would result from

the inadequate training. *See Harris*, 489 U.S. at 388–89. Plaintiff has not made this showing. Plaintiff presents evidence that Clackamas County Jail had a jumbled intake and assessment system where deputies and Corizon nurses were not clear on the role each played in assessing and triaging inmates arriving at the jail. She shows that Corizon may have been derelict in its duties to provide medical training to jail staff per the parties' contract. She also shows that Clackamas County's training for intake staff was inadequate given its role in conducting what is essentially an initial medical screening. However, even if Plaintiff can create a question of fact about the adequacy of intake training, Plaintiff has produced no evidence that Clackamas County or Corizon knew or should have known about a pattern of constitutional violations caused by the inadequate training. *See Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

Plaintiff may establish *Monell* liability without showing a pattern of constitutional violations if it was obvious to Clackamas County and Corizon that the failure to train would lead to constitutional violations. *Id.* at 64. Single-incident liability is rare and found only "in a narrow range of circumstances" where a constitutional violation is a "highly predictable consequence of the failure to train." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 398 (1997) (herein *Bryan Cty.*). This is not one of the rare cases where single-incident liability can support a failure to train theory. Plaintiff has not established a question of fact that the inadequacy of the training was patently obvious to Clackamas County and Corizon. While a reasonable jury might conclude that the quality of training or amount of training constituted negligence, it was not so egregious that a resulting constitutional violation was "highly

predictable." Consequently, the Court grants Clackamas County and Corizon summary judgment on Plaintiff's failure-to-train *Monell* claim related to proper intake screening.

### b.  Toxicities of Methamphetamines and Bath Salts

Plaintiff argues Corizon and Clackamas County had a custom or practice of not training medical or correctional staff on the toxicities of methamphetamines and bath salts.

Plaintiff presents the following evidence on her failure to train theory related to the toxicities of methamphetamines and bath salts. Corizon was aware of the dangers of bath salts at the time of Mr. Perry's death and that training on the dangers of bath salts was important. This is supported by the testimony of Corizon's Regional Medical Director at the time and the existence of the 2013 briefing. Plaintiff also shows that despite this knowledge, at the time of Mr. Perry's death, there was not a clear companywide policy on the hazards of bath salts. The standard operating procedures available to Corizon nurses working at Clackamas County Jail did not have protocols specific to methamphetamines or bath salts. Finally, she presents evidence that nursing staff never received training on the dangers of bath salts and did not remember receiving training on methamphetamine overdose and withdrawal.

As to Clackamas County, Plaintiff shows that Clackamas County was aware that it was common for inmates to have taken methamphetamines and bath salts, and at least creates a question of fact as to whether jail staff received training on methamphetamines and bath salts.

As with the prior failure to train claim, Plaintiff does not present evidence that either Clackamas County or Corizon knew or should have known about a pattern of constitutional violations caused by inadequate training about methamphetamines or bath salts at Clackamas County Jail. She only shows that both parties were aware of the risks associated with methamphetamine and bath salt intoxication and the prevalence of both at Clackamas County

Jail. Thus, to prevail, Plaintiff must show that the "unconstitutional consequences of failing to train" was "patently obvious" and that a constitutional violation was a "highly predictable consequence' of the decision not to train." *Kirkpatrick*, 843 F.3d at 794.

Plaintiff cannot make this showing as to Clackamas County. While Clackamas County staff played a role in initial intake, which at the time of Mr. Perry's death included an initial medical assessment, the ultimate responsibility of medical evaluations and care rested with Corizon. While it may have been prudent for Clackamas County to ensure that its staff were properly trained on these substances, "[m]ere negligence will not suffice to show *Monell* liability." *Benavidez*, 993 F.3d at 1134. The Court grants Clackamas County summary judgment on Plaintiff's failure-to-train *Monell* claim related to training on methamphetamines and bath salts.

But, viewing the facts in the light most favorable to Plaintiff, the record shows genuine issues of material fact that preclude summary judgment on this claim as to Corizon. Corizon was aware that bath salts presented a significant risk of overdose and death. It had even developed training material to that effect. Yet, Corizon did not train staff working at the time of Mr. Perry's death on the specific risks of bath salts and at least two nurses testified that they could not recall training on the risks of methamphetamine overdoses and withdrawals. Additionally, the available protocols on substance abuse withdrawal did not include specific direction on methamphetamine or bath salts. Corizon's Regional Medical Director testified that medical staff in the jail, "should be trained about the effects of methamphetamine and bath salts, and they should be aware of it, and should know what signs and symptoms to look for." Stavley Decl. Ex. D 36:21-24. For these reasons, a reasonable juror could conclude that the potential risk of constitutional violations by Corizon nurses who may have lacked the knowledge to effectively assess and treat

methamphetamine and bath salt toxicity in the jail was so obvious that Corizon's failure to provide adequate training for their staff constituted deliberate indifference. *See Bryan Cty.*, 520 U.S. at 409–10 (finding a "high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable").

This case is unlike *Connick* where the Supreme Court held that the "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton's* hypothesized single-incident liability." *Connick*, 563 U.S. at 64. In that case, the Court found that given the "regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 66 (quoting *Bryan Cty.*, 520 U.S. at 409). Here, the Corizon nurses have an ongoing obligation to provide constitutionally adequate medical care. This necessarily includes training on risks and conditions prevalent in the jail. Corizon failed to provide training on substances it knew were both dangerous and commonly seen at Clackamas County Jail. Just as the prosecutors in *Connick* should have received general training in law school about *Brady* violations, Corizon nurses should have received general medical training in nursing school. But there is nothing in the record that suggests this general training covered the acute risks of methamphetamines and bath salts such that Corizon would be relieved of its obligation to train nurses on these substances. A reasonable juror could conclude that the lack of training on these substances resulted from Corizon's deliberate indifference to the rights of inmates its staff treated.

The Court also finds that Plaintiff creates a question of fact as to whether Corizon's failure to train on methamphetamines and bath salts was the "moving force" behind Mr. Perry's

death. *Monell*, 436 U.S. at 694–95. While the failure to train was not the only cause of Mr. Perry's death, a reasonable juror could conclude that Nurse Rackley and Nurse Valberg's lack of knowledge specific to these drugs was a substantial factor in causing Mr. Perry's death. Indeed, a reasonable juror could conclude that Corizon's deliberate indifference in failing to train its staff contributed to the deliberate indifference of its nurses, as they were unable to appropriately recognize deadly drug toxicity, withdrawal, and decompensation generally. Accordingly, the Court denies Corizon summary judgment on this claim.

### iii. Custom or Practice

Plaintiff advances three custom or practice theories for *Monell* liability against Clackamas County and Corizon. They are: (1) admitting severely intoxicated people into the jail rather than referring them to acute care, (2) having an entrenched custom of indifference to the rights of inmates, and (3) understaffing and providing no physician supervision.

To succeed on a *Monell* claim based on a longstanding custom or practice, the custom or practice "must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino v. Gates*, 99 F.3d 911, 919 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691); *see also Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008) (holding that municipal liability may be established "by showing 'a longstanding practice or custom which constitutes the standard operating procedure of the local government entity'") (quoting *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)). "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom" under *Monell*. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

//

//

### a. Admitting Severely Intoxicated People into the Jail

Multiple jail staff testified that they regularly see intoxicated people at Clackamas County jail. Stavley Decl. Ex. J at 12, Ex. L 26:9-14, Ex. M 9:12-10:4. Sergeant Johnson testified that he had seen people more intoxicated than Mr. Perry admitted to the jail. Stavley Decl. Ex. J 33:2-3. Sergeant Taylor testified that Clackamas County admits people who are severely meth intoxicated "at least weekly" and that it was "very common" to place highly intoxicated individuals on methamphetamines in a holding cell. Stavley Decl. Ex. P 21:4-23. Nurse Rackley testified that Mr. Perry was not the most intoxicated person she had ever kept in the jail and that his condition was similar to many other patients she had seen. Stavley Decl. Ex. F 111:16-19, 112:5-9, 112:24-113:1. She also testified that she could not recall whether she had ever sent anyone to the emergency room due to intoxication. *Id.* at 112:10-12. Nurse Valberg testified that she had seen inmates more impaired than Mr. Perry in the jail and that this kind of behavior occurred "frequently" and was "not really uncommon." Stavley Decl. Ex. G 107:15-25, 109:14-16. With this evidence, Plaintiff establishes a question of fact as to whether Clackamas County and Corizon had a long-standing practice of admitting intoxicated people into the jail, and from the testimony of Sergeant Johnson, Sergeant Taylor, Nurse Rackley, and Nurse Valberg a reasonable juror could conclude that they also had a practice of admitting *severely* intoxicated people into the jail.

To prevail on this theory plaintiff must show (1) "a direct causal link" between Clackamas County and Corizon's custom and the alleged constitutional deprivation and (2) that "the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the jail's] inhabitants.'" *Castro*, 833 F.3d at 1076 (quoting *City of Canton*, 489 U.S. at 385,

392). "The Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry." *Id.* at 1076.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff creates a question of material fact as to whether Clackamas County and Corizon's practice of admitting severely intoxicated people to the jail was a direct cause of Mr. Perry's death. Had the County and Corizon followed their own policies, it is almost certain Mr. Perry would have been transferred to the hospital where his condition could have been closely monitored, as was the case with Ms. Mountsier.

Plaintiff also creates a question of fact as to whether Clackamas County and Corizon knew that their custom of admitting severely intoxicated people into the jail would lead to violations of inmates' constitutional rights. The "Corizon Health – Clackamas County Jail Fit for Confinement Guidelines" note that "impairment with alcohol or illicit substances rendering the individual incoherent, confused, or unable to stand or walk without assistance" is a condition that may require medical assessment by a physician before acceptance into Clackamas County Jail. Stavley Decl. Ex. B at 12. Clackamas County Sheriff's Office, Jail Division's policy manual states: "'Inmates in need of immediate attention for a serious medical problem shall not be admitted to the Clackamas County Jail until examined by a physician and documentation of such medical attention is delivered to the CCJ.' 'Those individuals appearing to be under the influence of drugs and/or alcohol, who also exhibit behavior that would lead one to believe that they are in medical distress, will be sent to the hospital immediately to be medically cleared by a doctor before such admittance into custody.'" Stavley Decl. Ex. P 27:12-23. Per their contract, Clackamas County and Corizon were also aware of the NCCHC standards. Under those standards, a "Compliance Indicator" is "[I]nmates experiencing severe or progressive

intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility." Stavley Decl. Ex. T at 72. The discussion section of the relevant NCCHC standard also states:

> Detoxification and withdrawal are best managed by a physician or other medical professionals with appropriate training and experience. As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions.

*Id.*

Based on Clackamas County and Corizon's adoption of these policies and awareness of the NCCHC standards, a reasonable juror could conclude that Clackamas County and Corizon knew of the substantial risk of serious harm of admitting severely intoxicated people into the jail. *See Castro*, 833 F.3d at 1077 (finding the "affirmative adoption of regulations aimed at mitigating the risk" that befell plaintiff proved knowledge of the risk) (citations omitted). A reasonable juror could further conclude that Clackamas County and Corizon were deliberately indifferent to that risk when they allowed severely intoxicated people to be admitted to the jail rather than transferred to more appropriate facilities.

Defendants claim that Plaintiff cannot establish a custom or practice that posed a substantial risk of serious harm because she offers no evidence of prior instances where a severely intoxicated person was admitted to the jail and died. A single violation of federal rights can result in municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *See Bryan Cty.*, 520 U.S. at 409. Defendants' own policies evidence their awareness that admitting severely intoxicated people into the jail posed a risk of serious harm to inmates. That no one in the past died or became dangerously ill due to this practice shows that Clackamas County and Corizon were fortunate, not that they were not deliberately indifferent. *See Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir.

2004) (finding the same). Accordingly, the Court denies Clackamas County and Corizon summary judgment on this claim.

### b.    Culture of Indifference

Plaintiff argues that Clackamas County had a custom, practice, or entrenched culture of indifference to the rights on inmates. Plaintiff relies on the same evidence for this theory as she did for her claim related to admitting severely intoxicated people into the jail. She only adds that Clackamas County did not discipline Deputy Shadrin for taking a video of Mr. Perry on her cell phone and that Deputies Sandquist and Paurus received written reprimands. Plaintiff does not submit enough evidence to create a question of fact as to a culture of indifference to the rights of inmates generally. Her evidence is specific to the issue of the right to adequate medical care once imprisoned, and as discussed above, she establishes a question of fact on that issue related to jail admissions. The record does not support a broad finding that that Clackamas County was deliberately indifferent to the rights of inmates across the board. Clackamas County is entitled to summary judgment on this theory of *Monell* liability.

### c.    Understaffing and Physician Supervision

Plaintiff argues that Corizon and Clackamas County had a policy of understaffing and providing no physician supervision. Plaintiff establishes that Clackamas County declined Corizon's request for more staffing and that it reduced the hours of the on-site physician to four per month. Plaintiff fails, however, to establish direct causation on this claim. Plaintiff's argument that a physician on-site would have prevented Mr. Perry's death is speculative. She makes multiple assumptions without support from the record. She also does not explain how more nursing staff would have changed the outcome, and she does not provide evidence or argument that a lack of Clackamas County staff caused Mr. Perry's death. Corizon medical staff attended Mr. Perry on

multiple occasions. The record supports that there is a question fact as to whether the incompetence or deliberate indifference of the Corizon medical staff caused Mr. Perry's death, not a lack of staff generally. Corizon and Clackamas County are entitled to summary judgment on this theory of *Monell* liability.

### C.     Supervisor liability

State officials are not vicariously liable for the actions of their subordinates. *Monell*, 436 U.S. at 694. A supervisor is liable under § 1983 only "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018). To make that showing, Plaintiffs must establish the supervisor's "'own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)).

Plaintiff argues that Nurse Petrov and Dr. Salazar should be liable for (1) failure to train and/or supervise Corizon's nursing staff on the toxicities of methamphetamines and/or bath salts; (2) acquiescence in Corizon's custom or practice of admitting into the jail, rather than referring to acute care facilities, severely intoxicated inmates; and (3) failure to train any staff on how to conduct medical screenings at the jail intake process.

First, Plaintiff does not show that Nurse Petrov and Dr. Salazar were personally involved in the alleged custom of admitting severely intoxicated people into the jail and offers no facts establishing their acquiescence in this practice. On the failure to train theories, Plaintiff provides no evidence that Nurse Petrov and Dr. Salazar directed, or were supposed to direct, Corizon's

staff training and were therefore the actual or proximate cause of the injury or culpable for these alleged failures. She shows that Corizon may have had a contractual obligation to provide medical training to Clackamas County but does not establish that these supervisors were charged with ensuring that training occurred. This is unlike *Starr v. Baca*, where the supervising sheriff was charged with prisoner's safekeeping by law and had knowledge of the problem, but failed to act to remedy unconstitutional conditions in the jail. 652 F.3d at 1208. Here, Plaintiff does not provide evidence of personal involvement, acquiescence, culpability, or a sufficient causal connection to create a question of fact for the jury on these claims. The Court finds that Defendants Nurse Petrov and Dr. Salazar are entitled to summary judgment on the claims against them.

## II.    Negligence

Plaintiff alleges a negligence claim against Clackamas County on several bases. Plaintiff brings her state law negligence claim against Clackamas County because under the Oregon Tort Claims Act, tort claims against public employees committed in the course of employment must be brought against a public body. *See* Or. Rev. Stat. § 30.265(2).

Defendant argues that Plaintiff's negligence claim cannot proceed to trial because it is based on the same operative facts as her § 1983 claims. Under Oregon law, intentional conduct does not support a claim for negligence. *Woods v. Gutierrez*, No. 3:11-CV-01082-BR, 2012 WL 6203170, at *12 (D. Or. Dec. 12, 2012) (citing *Kasnick v. Cooke*, 116 Or. App. 580, 583 (1992)). Accordingly, judges in this District have found that a negligence claim cannot be based on the same facts as a Fourth Amendment § 1983 claim. *See Dickerson v. City of Portland*, No. 3:19-CV-01126-SB, 2020 WL 7391267, at *9 (D. Or. Dec. 16, 2020) (collecting cases). However, Plaintiff's § 1983 claim is based on the Eighth Amendment, not the Fourth Amendment.

Deliberate indifference "requires a showing of only subjective recklessness—not intent," and "Oregon law permits a plaintiff to proceed on alternative theories of negligence and recklessness." *Johnson v. Tillamook Cty.*, No. 3:15-CV-00125-PK, 2016 WL 11383939, at *11 (D. Or. Apr. 18, 2016), *report and recommendation adopted*, No. 3:15-CV-00125-PK, 2016 WL 3946919 (D. Or. July 20, 2016) (holding a plaintiff may bring a § 1983 claim for deliberate indifference to medical needs and a negligence claim and describing relevant Oregon law). Accordingly, Defendant Clackamas County is not entitled to summary judgment on this basis.

> To prevail on a common-law negligence claim under Oregon law, a plaintiff must prove:
>
> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiffs harm, and (5) that plaintiff was within the class of persons and plaintiffs injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506 (2010) (citations omitted). Thus, a defendant is liable only for the foreseeable consequences of their negligence "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty." *Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987).

The parties agree that a special relationship existed between Clackamas County and Mr. Perry. In Oregon, "[w]hen a special relationship or status gives rise to the duty of care, that relationship or status *may* also define the scope of the duty by specifically describing the types of harms or class of persons that it encompasses ... where the special relationship does not prescribe the scope of the duty, common law principles of reasonable care and foreseeability of harm are relevant." *Allstate Ins. Co. v. Tenant Screening Servs. Inc.*, 140 Or.App. 41, 50 (1996) (emphasis in original) (internal citation and quotation omitted).

The parties disagree on the scope of the duty Clackamas County owed Mr. Perry based on their relationship. Defendant argues that ORS 169.140 delineates the duty of jailer to inmate and only requires the provision of "necessary medical aid." Defendant also relies on the Restatement of Torts § 314A "Special Relationships Giving Rise to a Duty to Protect" to define the duty. Plaintiff argues Clackamas County's duty was not limited by ORS. 169.140 and instead relies on *Buchler v. State By & Through Oregon Corr. Div.*, 316 Or. 499 (1993) to argue that Clackamas County was a custodian.

*Buchler v. State By & Through Oregon Corr. Div.* concerned an escaped convict who shot two members of the public after he fled his rural worksite in a state van. *Id.* at 502. Analyzing negligence claims against the state, the court considered the duty the state owed to the public to control inmates in its care. *Id.* at 505. Relying on the Restatement (Second) of Torts § 319, the court found that the state's status as a custodian of a prisoner raised the duty of care it owes to third persons. *Id.* This case does not concern the duty owed to third persons or members of the public, but to a prisoner himself. *Buchler*, therefore, cannot define the duty owed to Mr. Perry.

ORS 169.140 directly addresses the duty owed here. ORS 169.140 requires local correctional facilities to provide all prisoners in their custody "necessary medical aid." Oregon courts also consistently look to the Restatements to "provide useful guidance regarding the duty imposed as the result of a special relationship or status." *Crane v. United States*, No. 3:10-CV-00068-AC, 2013 WL 1453166, at *4 (D. Or. Mar. 21, 2013), *report and recommendation adopted*, No. 3:10-CV-00068-AC, 2013 WL 1437816 (D. Or. Apr. 9, 2013) (citing *Stewart v. Kids Inc. of Dallas*, OR, 245 Or. App. 267, 278 (2011)). Here, the Second Restatement of Torts § 314A(4) "Special Relations Giving Rise to Duty to Aid or Protect" is particularly apt. Indeed,

other courts have relied on this section to define the relationship between jailers and prisoners.

*See id.* (collecting cases). The Second Restatement of Torts § 314A(4) provides that "One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." Comment f to § 314A(4) further provides:

> The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him . . .

*Id.*

With this guidance, the Court finds that Clackamas County staff had a special relationship to Mr. Perry that required them to take reasonable actions under the circumstances to provide necessary medical aid to him. Defendant Clackamas County argues it discharged this duty by putting Mr. Perry in the hands of the Corizon nurses. Defendant Clackamas County is not entitled to summary judgment on this basis.

Plaintiff creates a question of fact as to whether Defendant Clackamas County breached its duty of care to Plaintiff. The actions of Sergeants Taylor and Johnson provide one example. First, the record shows that Sergeants Taylor and Johnson were aware of Mr. Perry's serious medical condition. It also shows that they were involved in the decision to transfer Ms. Mountsier to the hospital and were therefore aware of the limited healthcare services the Corizon nurses could provide at the jail. Second, there is at least a dispute of fact whether the Sergeants took reasonable steps under the circumstances to ensure Mr. Perry was in the hands of someone competent to care for him given his degree of illness. Defendant Clackamas County is correct

that the Corizon nurses attended Mr. Perry in a limited capacity. However, given Mr. Perry's presentation, there is a question of fact as to whether it was reasonable to rely on them alone. The Court denies summary judgment on Plaintiff's negligence claim against Clackamas County.

Finally, Plaintiff argues Clackamas County is vicariously liable for Corizon's actions. Defendant Clackamas County concedes that it and Corizon are in a non-employee agent relationship. "[F]or a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim." *Vaughn v. First Transit, Inc.*, 346 Or. 128, 138 (2009). Plaintiff alleges that Clackamas County directed when and how the Corizon nurses checked on Mr. Perry. She does not, however, offer any evidence to support her allegation that Clackamas County controlled how the Corizon nurses checked on Mr. Perry. She does proffer evidence that Clackamas County directed when the Corizon nurses checked on Mr. Perry to some extent but this alone is not enough to establish vicarious liability. Stavley Decl. Ex. J 43:14-44:17. "[A] principal that 'authorizes' a nonemployee agent to act on the principal's behalf is not, for that reason alone, liable when the agent injures a third party because the agent was negligent in carrying out its authorized activities." *Vaughn*, 346 Or. at 139. She also points out that Clackamas County previously denied Corizon funding for more staff. This evidence only supports that the parties were in an agency relationship, since Clackamas County determined the extent to which Corizon would act on its behalf through funding. *Id.* at 136. Accordingly, Plaintiff does not point to sufficient facts to establish a question of fact as to whether Clackamas County should be held liable for Corizon's alleged negligence.

//

//

### III.    Gross Negligence

Plaintiff brings a claim for gross negligence against Corizon. Plaintiff and Defendant Corizon agree that the arguments and evidence establishing a question of fact as to liability for deliberate indifference are sufficient to establish a question of fact as to liability for Plaintiff's gross negligence claims. Accordingly, Defendant Corizon is not entitled to summary judgment on gross negligence, as the Court found that a reasonable juror could conclude that the Corizon nurses were deliberately indifferent to Mr. Perry's serious medical needs.

### CONCLUSION

Defendant Clackamas County's Motion for Summary Judgment [74] is GRANTED IN PART and DENIED IN PART as follows: (1) the Court denies Clackamas County summary judgment on Plaintiff's *Monell* claim based on a custom or practice of admitting severely intoxicated people into the jail; (2) the Court grants Clackamas County summary judgment on Plaintiff's remaining *Monell* claims; (3) the Court denies Clackamas County summary judgment on Plaintiff's negligence claim.

Clackamas County Individual Defendants' Motion for Summary Judgment [70] is GRANTED IN PART and DENIED IN PART as follows: (1) the Court grants Defendants Shultz, Johnson, and Taylor summary judgment on Plaintiff's § 1983 claims; (2) the Court denies Defendants Paurus, Sandquist, and Shadrin summary judgment on Plaintiff's § 1983 claims.

Defendant Corizon's Motion for Partial Summary Judgment [67] is GRANTED IN PART and DENIED IN PART as follows: (1) the Court denies Defendants Rackley and Valberg summary judgment on Plaintiff's § 1983 claims; (2) the Court grants Defendants Petrov and Salazar summary judgment on Plaintiff's § 1983 supervisory liability claims; (3) the Court

denies Corizon summary judgment on Plaintiff's *Monell* claim based on a custom or practice of admitting severely intoxicated people into the jail and on a failure to train staff on the toxicity of methamphetamines and bath salts; (3) the Court grants Corizon summary judgment on Plaintiff's remaining *Monell* claims; (4) the Court denies Corizon summary judgment on Plaintiff's gross negligence claim.

IT IS SO ORDERED.

DATED:_____June 18, 2021_____.

MARCO A. HERNÁNDEZ
United States District Judge